Phillip J. BROWN, et al., Petitioners,

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent.**

Oliver T. Carr, Jr. & George
Beuchert, Intervenors.

No. 13670.

District of Columbia Court of Appeals.

Argued En Banc March 5, 1984.

Decided Dec. 21, 1984.

Nicholas A. Addams, Washington, D.C., for petitioners.

Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Washington, D.C., at the time the petition for rehearing en banc was filed, Richard W. Barton, Deputy Corporation Counsel, Washington, D.C., at the time the petition for review was filed, and Leo N. Gorman, Asst. Corp. Counsel, Washington, D.C., entered appearances, for respondent.

Whayne S. Quin, Washington, D.C., with whom Norman M. Glasgow, Washington, D.C., was on the brief, for intervenors.

John J. McAvoy, Washington, D.C., on behalf of the Legal Ethics Committee of the District of Columbia Bar, appointed by this court as amicus curiae.*

Before PRYOR, Chief Judge, NEBEKER, MACK, NEWMAN, FERREN, BELSON, and TERRY, Associate Judges, and KERN ** and GALLAGHER, Associate Judges, Retired.

FERREN, Associate Judge:

This case presents the question whether two former attorneys for the District of Columbia violated DR 9-101(B) by accepting private employment in a "matter" for which they had substantial responsibility while in government. We hold that the present transaction—an application to the Board of Zoning Adjustment (BZA) for a special exception to permit additional off-street parking—is not the same as, or substantially related to, any matter these at-

---

* We wish to express our appreciation to Mr. McAvoy and the members of the Legal Ethics Committee of the District of Columbia Bar for participating as amicus curiae. According to amicus, "this brief reflects solely the collective views of the members of the Committee on Legal Ethics and should not be construed as reflecting or representing the views of the District of Columbia Bar or its Board of Governors."

** Judge KERN was an *Associate Judge* of the court at the time of argument. His status changed to *Associate Judge, Retired,* on May 25, 1984.

torneys handled for the District. We affirm the unanimous BZA ruling that these individual attorneys, as well as intervenors' law firm, Wilkes & Artis, are not disqualified from this case.[1]

## I.

In *Brown v. District of Columbia Board of Zoning Adjustment,* 413 A.2d 1276 (D.C.1980) (*Brown I*), we noted that two lawyers with intervenor Carr's law firm, Iverson Mitchell and C. Francis Murphy, had served as counsel for the District of Columbia in two earlier transactions allegedly related to this one. Thus, we remanded the record to the BZA "for a determination of whether intervenor Carr's counsel should be disqualified because of previous responsibility for the same matter while employed by the District of Columbia." *Id.* at 1282. Specifically, we instructed the BZA to determine whether the present transaction and the two earlier ones concerning Oliver T. Carr's property in the Commercial-Residential (CR) Zone in the West End section of the District were the same "matter," within the meaning of DR 9–101(B). *Id.* at 1283, 1284. The three transactions are:

1. Litigation commenced by Carr in April 1975 against the Zoning Commission challenging, on Fifth Amendment grounds, the 60-foot height limitation on the property, in contrast with the general 90-foot height limitation in the rest of the zone. Carr's litigation, defended for the District by Mitchell, was successful; it increased the usable floor-area ratio for Carr's property from approximately 4.5 to 6.0 and thus increased the allowable rentable space.

2. Conversations and correspondence in October 1975 between Carr's attorneys and Corporation Counsel lawyers, including Murphy and Mitchell, about the legality of Carr's proposed air rights condominium that would mix residential and commercial uses on the same property. Carr abandoned the proposal for reasons unrelated to legal issues.

3. The present case: a 1977 application for a special exception under the zoning regulations to increase the number of below-grade parking spaces permitted for the residential "Westbridge" development on Carr's property. The firm of Wilkes & Artis—which Murphy and Mitchell had joined in 1976—represents Carr (another firm had represented Carr in the first two transactions). Mitchell's name was on some of the pleadings; neither Mitchell nor Murphy was effectively screened from participation.[2]

---

1. In 1978, when petitioners moved to disqualify intervenors' counsel, DR 9–101(B) provided:
 A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee. At that time, the Code of Professional Responsibility did not define "matter."
 In 1982, this court amended DR 9–101(B) to read:
 A lawyer shall not at any time accept private employment in connection with any matter in which he or she participated personally and substantially as a public officer or employee, which includes acting on the merits of a matter in a judicial capacity.
 *See "Revolving Door,"* 445 A.2d 615, 617 (D.C. 1982) (en banc) (per curiam). We defined "matter" as follows:
 "Matter" includes any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties.

2. *Id.* at 618. The new rule combined former DR 9–101(A) and (B) into one disciplinary rule without any intended substantive change. Thus, although we decide the present case under the old rule (since the 1982 amendments have prospective effect), the result would be the same if the new rule were applicable.
 For the record we note that on August 2, 1983, the American Bar Association's House of Delegates gave final approval to new Model Rules of Professional Conduct, including Rule 1.11 on "Successive Government and Private Employment." On September 12, 1983, this court ordered that these Model Rules "shall not become effective in the District of Columbia pending further order of this court" after comments and recommendations by the District of Columbia Bar and other interested bar associations and persons.

2. The BZA found:
 There was no screening [at Wilkes & Artis] until approximately July of 1980, when

After remand, the BZA held a hearing, reviewed the testimony, and determined that the three transactions were not the same "matter." The BZA accordingly concluded the disqualification of Wilkes & Artis (based on the presence of Murphy and Mitchell) was not required.[3]

A division of this court, with one judge dissenting, reversed the BZA ruling after concluding, as a matter of law, that the special exception case at issue here constitutes the same "matter" as the two earlier transactions, within the meaning of DR 9–101(B). *Brown v. District of Columbia Board of Zoning Adjustment,* No. 13670 (D.C. July 15, 1983) (*Brown II*). Again, the division remanded the record to the BZA. *Id.,* slip op. at 27. Before further proceedings, however, this court granted respondent's petition for rehearing en banc and vacated the division opinion in *Brown II* (order filed Sept. 29, 1983).

## II.

In *Committee for Washington's Riverfront Parks v. Thompson,* 451 A.2d 1177

screening procedures were first implemented. Therefore, Messrs. *Mitchell [and] Murphy were not screened by the Wilkes and Artis law firm from participating in the subject BZA application No. 12531.* The Board finds that, while the procedures of the firm of Wilkes and Artis for screening new employees left much to be desired, both Messrs. Murphy and Mitchell were effectively screened as a practical matter with respect to participation in the subject special exception. [Emphasis added.] Because of the express findings that there were no screening procedures until July 1980 and that Mitchell and Murphy "were not screened" from participating in the special exception case, the BZA's conclusion that "Murphy and Mitchell were effectively screened as a practical matter" is a non sequitur and thus clearly erroneous.

3. At the hearing on remand on October 8, 1980, petitioners' counsel explored alleged contacts in 1973 between Corporation Counsel Murphy and attorneys from Wilkes & Artis (representing Carr) concerning legislative creation of the CR Zone. *See post* at 62. On cross-examination, Murphy testified: "I have no independent recollections. I'm not saying I didn't meet with them but I don't recall it." On October 23, 1980, petitioners' counsel filed a motion to reopen the record and to conduct a further hearing to explore these alleged contacts and other matters. As exhibits, counsel attached copies of letters from counsel for Carr (other than Wilkes & Artis) referring to meetings between Norman Glasgow of Wilkes & Artis and Murphy addressing, among other things, "four approaches to obtaining this new [CR] zoning." *See post* at 62. On November 10, 1980, Steven E. Sher, Executive Director of the BZA, wrote petitioners' counsel that his motion had been denied "on the grounds that the Motion contained no issues or evidence that the Board had not entertained before and that all parties had sufficient time to present their cases and cross-examine." Apparently, the BZA concluded, after two hearings, that it was late in the day for petitioners to try to introduce still another transaction allegedly related to the special exception case. Nonetheless, in its final order of November 12, 1981, the BZA acknowledged the exhibits filed with petitioners' motion and stated in finding 18: "The Board finds that, even assuming those contacts, there is no relationship, factual or legal, between the public hearings on the CR zoning issues and the subject special exception."

The dissenters use the letters concerning creation of the CR zone, attached to petitioners' motion to reopen, as though they reflect a fourth transaction at issue in this case—a transaction that was not part of the initial proceeding and was not at issue on remand. But even if we assume that creation of the CR zone itself was at issue, it was not substantially related to the application for a special exception. From all that appears of record (including the letters proffered with petitioners' motion), the facts and issues germane to processing the CR zoning text amendment through the Zoning Commission in 1973–74 are entirely different from those pertinent to advocating a special exception to that zoning, under other regulations, before the BZA in 1977–78. Aside from saying that each "affects parking" on the Carr property in the West End, which creates an "appearance of impropriety," petitioners have proffered nothing to show the critical condition required for finding a substantial relationship between the two transactions: that information (other than general agency expertise) apparently available to Murphy during the CR zoning period may have been relevant to issues in the special exception case. *See infra* Part IIB.

Even if there were doubt here, the proper disposition would not be to disqualify intervenors' counsel but to remand to the BZA for further proceedings as to whether creation of the CR zone itself is substantially related to the application for a special exception. This court cannot validly take letters attached to petitioners' motion, not subject to objection or cross-examination, and use them as evidence for appellate court fact-finding, in the first instance, that a substantial relationship exists.

(D.C.1982), we implicitly concluded that, under DR 9–101(B), matters will be deemed the same if substantially related to one another.[4] It is useful, preliminarily, to review why that test evolved and how it generally applies.

## A.

The "substantially related" test originated in litigation between private parties. *T.C. Theatre Corp. v. Warner Brothers Pictures, Inc.*, 113 F.Supp. 265 (S.D.N.Y.1953), *aff'd*, 216 F.2d 920 (2d Cir.1954). The court considered a motion to disqualify counsel on the ground of unethically "switching sides"—of improperly taking legal action against a former client. The

**4.** In *Riverfront Parks*, we cited with approval the definitional language of the American Bar Association characterizing a "matter" as "'a discrete and isolatable transaction *or set of transactions* between identifiable parties....'" *Id.* at 1188 (quoting ABA Comm. on Professional Ethics and Grievances, Formal Op. 342 at 6 (1975)) (emphasis added). By referring to a "set of transactions," we implicitly adopted the "substantially related" test. Our definition of "matter" under the 1982 amendment of DR 9–101(B), *see supra* note 1, is intended only to identify the types of transactions embraced by that term; it does not affect the "substantially related" test.

**5.** In announcing the rule, the court explained that it would not inquire as to whether there actually had been a breach of the confidential relationship:

> I hold that the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

*T.C. Theatre Corp.*, 113 F.Supp. at 268–69. Other courts agree. "In order to grant a disqualification motion, a court should not require proof that an attorney actually had access to or received privileged information while representing the client in a prior case." *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 740 (2d Cir.1978). Rather, the court need only ask

court was concerned, primarily, about a violation of Canon 6 of the ABA Canons of Professional Ethics (restated as Canon 4 of the ABA Code of Professional Responsibility), enjoining lawyers to preserve client confidences and avoid conflicts of interest. The question, therefore, was whether counsel may have received confidential information from the former client that could be used against it in the subsequent representation. 113 F.Supp. at 268–69. The court announced the following rule: "Where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited." *Id.* at 268 (footnote omitted).[5]

"'whether it could reasonably be said that during the former representation [that] attorney *might have acquired* information related to the subject matter of the subsequent representation.'" *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978) (citation omitted) (emphasis added). Thus, when a party seeking disqualification carries its burden of persuading the factfinder that two matters, handled by the same counsel, are substantially related, there is an irrebuttable presumption that counsel received information during the first representation that is relevant to the second.

The foregoing analysis speaks in terms of a single lawyer involved in two matters found to be substantially related. When, instead, a law firm is involved in either of two substantially related matters, questions sometime arise concerning the extent to which information has been shared among individual attorneys within the firm. For example, when a firm has provided representation in the first of two related matters, a court may have to determine whether an individual attorney who has since left the firm should be permitted, in effect, to switch sides by representing a party in the second matter adverse to his former firm's client in the first matter. In this situation, courts have established a rebuttable presumption that an attorney has received confidential information during the first matter. Thus, disqualification will be required unless the attorney clearly shows that, while at the firm, he or she did not work on the case and was not otherwise in a position to gain access to confidential information related to the first matter. *See Silver Chrysler Plymouth v. Chrysler Motor Corp.*, 518 F.2d 751, 754 (2d Cir.1975); *see generally* Liebman, *The Changing Law of Disqualification: The Role of Presumption and Policy*, 73 Nw.U.L.Rev. 996 (1979). Second, when an individual attorney has admittedly had substantial responsibility for the first of

Courts considering side-switching from one private client to another have consistently followed this formulation. *E.g., Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980); *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739–40 (2d Cir.1978). The question for us, of course, is how this side-switching case law applies in the "revolving door" context—in our case a government attorney who leaves to join a private firm and begins to represent clients against, or before an agency of, the former government employer. *See generally "Revolving Door,"* 445 A.2d 615 (D.C. 1982) (en banc).[6]

## B.

The first significant case to consider a revolving door disqualification was *United States v. Standard Oil Company,* 136 F.Supp. 345 (S.D.N.Y.1955) (Kaufman, J.). The court not only invoked old Canons 6 and 37 (avoiding conflicts of interest and preserving client confidences) but also applied the revolving door rule of old Canon 36: "A lawyer, having once held public office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ." The court

stressed that the purpose of Canon 36 "was to clarify the duties in Canon 6 as related to government attorneys," *id.* at 361, with a view to preventing "even the appearance that the government servant may take a certain stand in the hope of later being privately employed to uphold or upset what he had done." *Id.* at 359 (footnote omitted).

While recognizing this preventive purpose, the *Standard Oil* court imported into Canon 36 the same "substantially related" test used to evaluate private side-switching and thus the same focus on preventing misuse of confidential information. *Id.* at 353–55 (citing *T.C. Theatre Corp.*). The court expressly recognized "it is doubtful if the Canons of Ethics are intended to disqualify an attorney who did not actually come into contact with materials substantially related to the controversy at hand when he was acting as attorney for a former client now adverse to his position." *Id.* at 364. The court added, however, that a "complainant need only show *access* to such *substantially related* material and the inference that defendant received these confidences will follow." *Id.* at 354 (emphasis in original) (footnote omitted); *see supra* note 5.[7] Moreover, "where there is

two substantially related matters and later joins a law firm that seeks to represent an adverse party in the second matter, a court will have to determine whether the presence of the new attorney at the firm requires disqualification of the entire firm. Again, in this private side-switching context courts have adopted a rebuttable presumption that knowledge is shared among firm members. Courts therefore require disqualification of the entire firm absent a showing that the new partner or associate has been effectively screened from participation in the second matter. *See LaSalle National Bank v. County of Lake,* 703 F.2d 252, 257–59 (7th Cir.1983); *see generally* Peterson, *Rebuttable Presumptions and Intra-Firm Screening,* 59 NOTRE DAME L.REV. 399 (1984).

**6.** In *"Revolving Door"* we adopted DR 9–101(B), *see supra* note 1, precluding private employment with respect to any "matter" in which the attorney "participated personally and substantially" while in government; and, in response to the related, "imputed disqualification" problem, we adopted DR 9–102, permitting a firm that hires

a former government attorney to keep, or take on, such a matter if that attorney is properly screened from participating and sharing fees in it. 445 A.2d at 617. *See Sierra Vista Hospital, Inc. v. United States,* 226 Ct.Cl. 223, 639 F.2d 749, 753 (1981) (upheld denial of motion to disqualify law firm where former government attorney at firm, himself disqualified, was entirely screened from participation in case); *Armstrong v. McAlpin,* 625 F.2d 433, 445 (2d Cir.1980) (en banc) (same), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981) (disqualification motion not appealable under 28 U.S.C. § 1291); *Kesselhaut v. United States,* 214 Ct.Cl. 124, 555 F.2d 791, 793 (1977) (same).

**7.** The "rule" adopted in *Standard Oil* thus permits a complainant to make use of two inferences in seeking to disqualify a former government attorney. 136 F.Supp. at 354. First, a showing of "a substantial relationship between the subject matter of a law suit and the matters in which the attorney represented his former

a close question as to whether particular confidences of the former client will be pertinent to the instant case, an attorney should be disqualified to avoid the appearance if not the actuality of evil." *Id.* at 364.

Revolving door cases under Canon 9 of the ABA Code of Professional Responsibility (Avoiding Even the Appearance of Impropriety) have continued to reflect the *Standard Oil* court's emphasis on preserving client confidentiality. *E.g., Board of Education v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979); *see Committee for Washington's Riverfront Parks,* 451 A.2d at 1188, 1191, 1192.[8]

### C.

Revolving door cases, however, also address concerns in addition to confidentiality. As the *Standard Oil* court itself recognized, 136 F.Supp. at 359, the public must be protected against the possibility that government attorneys in a variety of ways will conduct "their offices with an eye toward future private employment," whether by law firms or prospective clients. *United States v. Ostrer,* 597 F.2d 337, 340 (2d Cir.1979); *accord Woods v. Covington County Bank,* 537 F.2d 804, 814 (5th Cir.1976); *General Motors Corporation v. City of New York,* 501 F.2d 639, 650 n. 20 (2d Cir.1974); *see* ABA Comm. on Professional Ethics, Opinion No. 37 (1931) (former ABA Canon 36 intended to deter government lawyers from being influenced "by the hope of later being employed privately either to uphold or to upset what [they] had done").[9] In *Standard Oil,* however, the court did not address these other concerns in order to determine whether the "substantially related" test was sufficiently responsive. We do so here.

We therefore turn to a second concern from the revolving door, arising from the fact that government attorneys often have

client" gives rise to "an inference that confidential information was reposed." *Id.* Second, if the complainant shows that the challenged attorney's government position provided access to materials substantially related to the second representation, even if the attorney did not handle the government case, the court will infer that the attorney actually gained personal knowledge of confidential information. *Id.; see generally* Kaufman, *The Former Government Attorney and the Canons of Professional Ethics,* 70 Harv.L.Rev. 657 (1957).

Under DR 9–101(B), the focus of the substantial relationship test is solely on the relationship between the subject matter of each representation at issue. Consideration of the attorney's relationship to the earlier government matter— *i.e.,* the attorney's potential access to useful government-developed information—is relevant to the separate DR 9–101(B) inquiry into whether the earlier matter was one in which the attorney "participated personally and substantially" (or, under the pre-1982 version of the rule, "had substantial responsibility"). Because we conclude that there is no substantial relationship between the subject matters of each of the three representations at issue here (and hence no inference of useful information received), we need not address the "substantial responsibility" issue in this case.

**8.** One court specifically has noted, however, that "the question of 'side-switching,' and of the conflict of interest which is almost certain to arise when counsel changes sides, is addressed by Canon 4 [Preservation of Confidences and Secrets of a Client] and not Canon 9 [Avoiding Even the Appearance of Impropriety]." *General Motors Corporation v. City of New York,* 501 F.2d 639, 650 n. 20 (2d Cir.1974). Nonetheless, courts commonly consider both ethical canons together, *e.g., Board of Education v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979); *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 224 (7th Cir.1978); *NCK Organization Ltd. v. Bregman,* 542 F.2d 128, 129 (2d Cir.1976). In these cases, the Canon 9 gloss—the concern about even an appearance of impropriety—is a significant reinforcement of the court's typical view that, under Canon 4, disqualification does not depend upon proof of an actual breach of confidentiality. *See supra* note 5.

**9.** At least one court considering side-switching from one private client to another has expressed a similar concern:

Both the lawyer and the client should expect that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation on the client's behalf. That professional commitment is not furthered, but endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter.

*Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980).

access to information that is generally not available to the private sector, even through discovery. They have access, for example, to grand jury proceedings and classified documents. *Woods*, 537 F.2d at 816. They also are often in a position to obtain statements from witnesses who, but for their willingness to respond to a government official, might be disinclined to cooperate. *Id.* Courts and the bar have called it fundamentally unfair for a former government attorney, newly in private practice, to use "specific information obtained by the exercise of government power"—information that otherwise would not be available to his or her client—to the prejudice of opposing private party litigants. *Id.* at 817; *Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago*, 283 F.Supp. 464, 468 (D.Minn. 1968), *aff'd*, 408 F.2d 1099 (8th Cir.), *cert. denied*, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73 (1969); ABA Comm. on Professional Ethics & Grievances, Formal Op. No. 135. This unfairness exists even if the former client, the government, is not prejudiced by the lawyer's subsequent use of the information. Accordingly, Canon 9 may require disqualification even though in a literal sense no side-switching takes place, *i.e.*, even though the former government attorney later takes a position for a private client wholly consistent with the position he or she took on behalf of the government.

There is a third concern: the lure of private practice may undermine a government attorney's responsibilities to the public. In the first place, some government attorneys enjoy more latitude than private attorneys in deciding how to spend their time and their client's resources. Whereas a private attorney is limited to accepting or rejecting matters that prospective clients present, government attorneys in various agencies, at least above certain levels of the bureaucracy, have the power to define and shape their client's priorities. Thus, if a government attorney could anticipate changing employers to exploit his or her knowledge of a particular case for private gain—even without taking sides against

the government—there is a real possibility that government counsel could channel government resources into cases primarily suited to eventual, lucrative employment, rather than into cases more clearly in the public interest. *Compare General Motors Corp.*, 501 F.2d at 650 (former Department of Justice lawyer, who had represented government in antitrust action against General Motors, disqualified from later bringing similar suit against General Motors on behalf of private party) *and Allied Realty of St. Paul*, 283 F.Supp. at 469 (former Assistant United States Attorney disqualified from representing private party in civil mortgage fraud action against bank, having represented government in criminal fraud action against bank on same claim) *with Woods*, 537 F.2d at 814 (former reserve officer in Navy Judge Advocate General's Corps, who laid groundwork for suit on behalf of former prisoners of war on instructions of superiors, did not have authority or opportunity to direct resources and thus was not barred from representing POWs in private suit).

Similarly, while not initiating a case for later private purposes, a government attorney could structure a case in a way that might leave room for later private employment; *e.g.*, the attorney could fashion a government complaint by adding or omitting a count that could help serve a later private action against the same defendant. Finally, in dealing with regulations or agency policies, a government attorney could neglect his or her duties in a way that later could inure to the benefit of a private employer in a case related to that neglect; *e.g.*, an attorney could pass upon, or shirk a clear duty to pass upon, the validity of a regulation in a way calculated eventually to exploit special knowledge of the weaknesses of that regulation in private practice. *See Standard Oil*, 136 F.Supp. at 359.

These first three concerns, reflecting the potential misuse of government-developed information, are addressable by an ethical rule, such as DR 9–101(B), barring former

government attorneys from participating in, and benefiting from, later transactions related to particular matters they handled for the government.[10] But there are several other concerns from the revolving door that exist even when the attorney's later work on behalf of private clients would have no identifiable relationship to particular government matters that the attorney previously had handled.

Thus, a fourth concern is that an attorney may at times choose to be over-zealous or under-zealous in representing the interests of the government client in the hope of "currying favor" with private sector employers and later being rewarded with private employment on *unrelated* matters.

Fifth, while in government, an attorney may develop a reputation by initiating or promoting policies that are calculated to advance that attorney's marketability in the private sector without regard to any particular kind of case.

Sixth, after leaving the government, an attorney may make use of expertise—special knowledge of agency policies, practices, and procedures acquired while on the government payroll—to the advantage of private clients.

Seventh, after leaving the government, an attorney may make use of government contacts (old friends) to gain special advantage for private clients.

No prophylactic rule short of a total ban on the revolving door itself could address these last four concerns since the post-government representation could not be barred simply by reference to previous participation in a related government matter. What is striking here, therefore, is the fact that, although we have identified seven concerns attributable to the revolving door, only the first three are addressed by the DR 9–101(B) disqualification for participation in substantially related matters.[11] The others, to the extent regulated at all, are covered—and only recently so—by criminal sanctions under the Ethics in Government Act of 1978, 18 U.S.C. § 207(c) (1982), barring specified federal and District government employees from appearing as agents or attorneys before their former government departments or agencies for a period of one year, without regard to what they may have handled while in government.[12]

One could argue, of course, that the prophylactic effect of DR 9–101(B) should be extended—in the spirit of § 207(c)—to cover appearances that do not necessarily reflect established or likely corruption of the subsequent litigation. The only basis for doing so, however, would be a policy judgment that, despite the absence of any prej-

---

**10.** *See Developments in the Law: Conflicts of Interest,* 94 HARV.L.REV. 1244, 1434 (1981) (recognizing three purposes underlying DR 9–101(B): (1) "protecting confidentiality"; (2) "denying the attorney's private client the unfair advantage of his attorney's earlier access to information gathered with the special powers and resources of the government"; and (3) "deterring the lawyer from compromising his official duties to advance employment interests in the same matter.")

**11.** As the Legal Ethics Committee of the District of Columbia Bar has noted with reference to DR 9–101(B):

[T]he rule is not worded so as to effectuate in all instances its stated purpose. For instance, there may be an appearance of professional impropriety in *any* instance where a lawyer, soon after leaving public employment, accepts compensation for representation of a private client who has benefited from decisions or recommendations made by the lawyer in his

public capacity. *This is true quite apart from whether the decisions or recommendations were made in the same "matter" in which representation was later undertaken.* Op. 26 (1977) (latter emphasis added).

**12.** Until the adoption of 18 U.S.C. § 207(c) (1982), Congress had been content to risk whatever real or apparent improprieties there may be in these other four consequences of the revolving door, in order to assure the government's ability to hire well-qualified lawyers and other employees. The assumption has been that the best lawyers, sooner or later, will want to join the more lucrative private sector, and that government cannot attract them in the first place unless they are relatively free to market their government experience.

Section 207(c) has no bearing on the present case because Murphy and Mitchell left the Corporation Counsel's office to join Wilkes & Artis in 1976, before § 207(c) was enacted.

udicial relationship between a government transaction and a former government attorney's later work for a private client, the attorney's government reputation, expertise, and contacts should, for the sake of appearances, be kept from the new private client. As the Legal Ethics Committee of the Bar has recognized, however, *see supra* note 11, neither the language of DR 9-101(B) nor its history indicates a purpose to define substantially related matters broadly enough to require disqualification solely on the basis of unseemly appearances.[13]

No one can dispute that government service affords lawyers the opportunity to impress potential employers, through legitimate or illegitimate means. The nature of the job brings government attorneys into contact with private practitioners and clients interested in their fields of expertise. If this reality alone could provide the basis for perpetual disqualification under DR 9-101(B)—as, in effect, it does during the one-year ban under § 207(c) of the Ethics in Government Act of 1978, *supra,* —then we would, for example, deter Federal Communications Commission lawyers from leaving government to practice, or join firms specializing in, communications law. We would deter Public Service Commission lawyers from leaving government to practice in the utilities field—and so on. Because the practice of law is becoming increasingly specialized, particularly in this jurisdiction where many administrative agencies are headquartered, we believe the likely consequence of such a wholesale approach to disqualification would be encouragement of a two-track—government lawyer, private lawyer—professional structure. We would eliminate the suspicion and the reality of ethical improprieties unrelated to particular government cases, but only at the cost of creating an insular, permanent legal bureaucracy. *See generally Developments in the Law: Conflicts of Interest,* 94 HARV.L.REV. 1244, 1428-30 (1981). We believe such a pervasive ban— far more severe than the one-year limit under § 207(c)—would deter too many capable attorneys from entering government service, to the detriment of the public. *See supra* note 12.

■ In sum, despite the many legitimate concerns about the revolving door, only three improprieties are addressed by DR 9-101(B). The lawyer: (1) may disclose confidential information to the prejudice of the government client; (2) may use information obtained through the exercise of government power to the prejudice of opposing private litigants; and (3) while in government, may have initiated, structured, or neglected a matter in the hope of

---

**13.** Other commentators have recognized that DR 9-101(B) "fails to address some potential abuses" of the revolving door. *Developments in the Law, supra* note 10, 94 HARV.L.REV. at 1437.

> Although [DR 9-101(B)] avoids actual abuse of authority in the matter itself, something further is needed to guard against problems of favoritism and undue influence on the part of former high-ranking agency officials.
>
> \* \* \* \* \* \*
>
> Concerns about the revolving door that relate more to undue influence and favoritism than to misuse of specialized knowledge are addressed by temporarily expanding disqualification to prohibit high-ranking agency officials from contacting their former agencies [i.e. by 18 U.S.C. § 207, as well as similar state statutes, prescribing mandatory "cooling off" periods for former government attorneys].

*Id.* at 1437, 1439; *see id.* at 1435-39.

Although "appearances" may be relevant to a decision under DR 9-101(B)—where those appearances arise from "the possible use of insider information," *Brown I,* 413 A.2d 1276, 1283 (D.C.1980)—DR 9-101(B) should not be stretched beyond its stated limits in an effort to remedy appearances of impropriety that exist irrespective of whether the former government attorney was involved in a previous related matter. *See generally* O'Toole, *Canon 9 of the Code of Professional Responsibility: An Elusive Ethical Guideline,* 62 MARQ.L.REV. 313, 326-33, 342-43 (1979) (describing "moderate" approach to attorney disqualification under Canon 9). Any attempt to use DR 9-101(B) to address concerns that are beyond the scope of the plain language of the rule will serve only to heighten suspicions about the integrity of the legal system, rather than bolster public confidence. *See Woods,* 537 F.2d at 813 ("An overly broad application of Canon 9 ... would ultimately be self-defeating.").

using it later for private gain. *See supra* note 10.

## D.

The question, then, is whether revolving door rule DR 9-101(B), reflecting two concerns in addition to protection of client confidentiality, should be interpreted to prescribe stricter criteria for attorney disqualification than the "substantially related" test that applies when an attorney switches sides from one private client to another.

Subject to a few refinements, we see no basis for a different test. In addition to forestalling breaches of confidentiality, the "substantially related" test—designed to prevent abuse of government-developed information—obviously covers the second potential impropriety. An opposing litigant cannot claim prejudice from the use of information acquired by the exercise of government power unless it can "reasonably be said that during the former representation the attorney might have acquired information related to the subject matter of the subsequent representation." *Cannon v. U.S. Acoustics Corp.*, 398 F.Supp. 209, 223 (N.D.Ill.1975), *aff'd in relevant part*, 532 F.2d 1118 (7th Cir.1976).

In cases implicating the third potential impropriety—initiating, structuring, or neglecting government representation with a view to private gain from the same or a related matter—the concern is not so much the attorney's eventual conduct in private practice; it is, rather, that the private conduct casts doubt on the integrity of the attorney's earlier public service. *Woods*, 537 F.2d at 814. Once again, however, unless a court could find that the attorney might have acquired information relevant to the eventual private action during the course of government employment, it is unlikely that the attorney developed the government case or neglected assigned responsibilities with the later, private action in mind.[14] Thus, the "substantially related" test is responsive as well to this third category of potential abuse.[15]

■ We conclude that the DR 9-101(B) revolving door rule, like a side-switching rule, is designed to address "at least a reasonable possibility that some specifically identifiable impropriety" would occur. *Woods*, 537 F.2d at 813. "It cannot be a fanciful, unrealistic or purely subjective suspicion of impropriety that requires disqualification." *United States v. Smith*, 653 F.2d 126, 128 (4th Cir.1981). As we see it, therefore—and here is the key to this case—only if specific information (as distinct from general agency expertise or contacts) that a former government lawyer may have had access to in one matter is likely to be useful in a subsequent matter, will there be a reasonable possibility of the

14. When two matters are so unrelated that a review of their factual contexts reveals no reasonable likelihood that a government attorney with substantial responsibility in the first had access to information that would be useful in the second (about the parties, the facts, or the peculiarities of the law developed), it is difficult to imagine how the first matter could serve as an intended vehicle for developing the second.

Consider, for example, a Department of Justice lawyer who investigates General Motors for possible antitrust violations. Conceivably, he or she could learn something of value for use later, as a private lawyer, in a products liability case either suing or defending General Motors. Standing alone, however, the factual connection between the two claims would be too tenuous to support an inference of an intent to prepare for the later case through the use of government-acquired information. Put another way, the lack of overlap between the claims makes it unlikely that the attorney channeled government resources into the antitrust investigation in the hope of learning something that would be useful in a later products liability action.

15. While in the private side-switching cases the courts typically have asked "whether it is reasonable to infer that the *confidential* information allegedly given would have been given to a lawyer representing a client in those matters," *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978) (emphasis added), in a "revolving door" case implicating the second or third category of abuse, confidentiality of the information is not the critical aspect.

particular improprieties that DR 9–101(B) is intended to forestall.[16]

### E.

■ There remains the question of the methodology for determining whether two matters are substantially related, such that a former government attorney may have had access to information useful in the subsequent proceeding. In determining whether private matters are "substantially related," the courts have examined both the facts and the legal issues involved. "Initially, the trial judge must make a factual reconstruction of the scope of the prior legal representation." *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978). If the factual contexts overlap, the court then has to determine "whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those [prior] matters." *Id.* Finally, if such information apparently was available to counsel in the prior representation, the court has to determine whether it "is relevant to the issues raised in the litigation pending against the former client." *Id.* If all three conditions are met, the matters will be substantially related and thus deemed the same for conflict-of-interest purposes, with doubts to "be resolved in favor of disqualification." *Id.; see Standard Oil Co.*, 136 F.Supp. at 354, 364.

While the "substantially related" test is basically the same for private side-switching and DR 9–101(B) revolving door cases, there are three reasons (related to the possible misuse of government-developed information) why the court must be especially careful in applying the test to former government attorneys—reasons that suggest a few refinements of the test under DR 9–101(B). First, because government attorneys may have had access to more kinds of information in connection with the prior representation than private attorneys typically do, there is a greater potential for misuse of information—including information that is not necessarily confidential in nature, *see supra* note 15—in the revolving door context. Second, the public is generally more concerned about government improprieties than about private improprieties. Thus, the appearance problem is more severe because the public is likely to be more critical of this potential misuse of information. Third, unlike a case of private side-switching, the party who seeks disqualification under DR 9–101(B) may not have been involved in the prior legal transaction. Consequently, the complainant may not have specific enough knowledge of the information gathered in the earlier transaction to proffer adequate support for the motion to disqualify, unless there is sufficient access to it through discovery.

■ Accordingly, in cases where the complainant's evidence shows that the factual contexts of the two (or more) transactions overlap in such a way that a reasonable person could infer that the former

---

16. As we instructed the BZA on remand in this case: "The critical test must be whether the government attorney in the former zoning proceeding had the opportunity to gather information he could not otherwise have gained which he could then use on behalf of the private party in the later proceeding. The information of concern is not general data, ... [but rather] specific information not available to the public." *Brown I, supra* note 13, 413 A.2d at 1283.

If a party who seeks disqualification need not show even a reasonable possibility that an actual impropriety, based on the likely abuse of government-developed information, has taken place, we would invite disqualification motions based entirely on hypothesis and innuendo. We would encourage time-consuming motions made for purely tactical reasons, at great cost to litigants and the courts. *Board of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979); *Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir.1977); *see W.T. Grant Co. v. Haines*, 531 F.2d 671, 677–78 (2d Cir.1976). We would encourage litigants to convert lawsuits into disciplinary inquiries when there is no reasonable possibility that the underlying proceeding is tainted, and thus would permit litigants, unfairly, to avoid the merits of a case by attacking opponent's counsel instead. *See Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982) (disqualification motions "should be viewed with extreme caution for they can be misused as techniques of harassment").

**50**

government attorney may have had access to information legally relevant to, or otherwise useful in, the subsequent representation, we conclude that the complainant will have established a prima facie showing that the transactions are substantially related.[17] The burden of producing evidence that no ethical impropriety has occurred will then shift to the former government attorney, who must rebut complainant's showing by demonstrating that he or she could not have gained access to information during the first representation that might be useful in the later representation.[18] Absent sufficient rebuttal, the complainant will have carried the burden of persuasion as the moving party.

■ It is important to stress that the attorney cannot meet this rebuttal burden simply by claiming that no useful information was, in fact, received in the first matter. If the factfinder is persuaded that two matters are substantially related—*i.e.*, that it is reasonable to infer counsel may have received information during the first representation that might be useful to the second—there arises a conclusive inference that useful information was, in fact, received. *See Westinghouse Electric Corp.*, 588 F.2d at 224 & n. 3; *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir.1973). Rebuttal evidence must therefore focus on "the scope of the legal representation" involved in each matter "and not on the actual receipt of ... information."

*Westinghouse Electric Corp.*, 588 F.2d at 224.

By announcing an approach that deems transactions substantially related if the former government attorney may have had access to any information that could be useful—not just legally relevant—in the later transaction, and by prescribing a methodology for determining when the burden of producing rebuttal evidence shifts to the attorney, we have broadened the scope of the "substantially related" test for revolving door purposes (as compared with the *Westinghouse Electric Corp.* approach).

**F.**

Before addressing the merits, we believe it is important to discuss the approach suggested by the helpful presentation of our amicus curiae, the Legal Ethics Committee of the District of Columbia Bar.

Amicus' suggested approach for determining whether transactions are substantially related is, in many respects, similar to the methodology we adopt today. Focusing on the context of the present case, amicus initially provided a three-factor test: "where transactions pertain to a single objective and involve the same property and the same party, public concerns about the fair administration of justice usually will support a determination that the transactions are part of the same matter."

While acknowledging that the meaning of the "single-objective" factor is "not self-

---

**17.** In making out a prima facie case, a complainant need not specify any particular information or material believed to be relevant to both of the related transactions. A showing of overlapping factual contexts may be sufficient to create an inference that the government developed information during the first matter which could be useful in the later private matter, and thus that the two matters are substantially related. *See Westinghouse Electric Corp.*, 588 F.2d at 224 ("the determination of whether there is a substantial relationship turns on the possibility, or appearance thereof, that confidential information may have been given to the attorney.... [I]t is not appropriate for the court to inquire into whether actual confidences were disclosed.").

**18.** To rebut a complainant's prima facie showing of substantial relationship, the former government attorney must produce evidence elaborating on the nature of the two matters so as to make it "clearly discernible" that the issues involved are unrelated and that the court should not infer the existence of useful government-developed information. *Westinghouse Electric Corp.*, 588 F.2d at 224. If the attorney is unable to produce such evidence, the complainant will have met the burden of persuasion on the substantial relationship test and disqualification can be avoided only on a different ground: the attorney must show that he or she did not "participat[e] personally and substantially" in the first matter. DR 9–101(B); *see supra* notes 1 and 7; *cf. supra* note 5.

evident," amicus stressed that this concept was devised to provide a "flexible factor" in the analysis "that permits a realistic assessment of reasonable public perception." Thus, "[g]iving meaning to the phrase will require the Court to take into account each situation's facts (too numerous and variable to identify in advance) and weigh them in light of the concerns to which the Rule is addressed and the potential occasions for abuses or improprieties which it seeks to prevent."

As to this case—contrary to the dissenters' implication—amicus did not specifically opine. Amicus left it to this court to apply the suggested test to the facts. Amicus added, however, that the transactions "need not all involve parking to constitute the same 'matter,'" but they "do not involve the same 'objective' ... if the most specific common purpose which can be said to underlie them is the general economic development of a property or project."

In further aid of the analysis, amicus stressed that "[e]ven where transactions involve the same party, same property or project and the same objective, ... certain facts, singly or in combination, may indicate that the transactions are not part of the same 'matter.'" For example, "[p]ublic concerns would be less justifiable where the former government attorney served in an agency or office not involved in or concerned with the subsequent proceeding." Moreover, "[t]he passage of an extended period of time should suggest that allegedly 'substantially related' transactions did not involve the same matter." Finally, a "former government attorney should also be free to present facts indicating that he or she did not learn information having special usefulness to his or her subsequent private client."

Amicus thus makes its three-factor test rebuttable. When viewed in light of this further refinement, the three-factor test appears to serve much the same function as the prima facie standard set forth above in Part IIE, *supra*. The attenuating circumstances suggested by amicus can ne-

gate the existence of a substantial relationship, even where all three factors in the initial test are met. We therefore recognize a distinct parallel between the methodology we adopt for determining whether two transactions are substantially related and the approach advocated by amicus.

Amicus suggests, however, that it formulated its objective, three-factor approach—which may be modified by reference to attenuating circumstances—because of the following belief: an exclusive focus on whether the former government attorney may have had access to information in the first case that could be useful in the second one is not responsive enough to the multiple concerns created by the revolving door, such as the possibility that a government attorney, with an eye to future private employment, might not vigorously represent the government or might otherwise show favoritism to private parties.

Our disagreement with amicus' approach is twofold. First, as explained in Part IIC and D, *supra*, the only concerns about the revolving door that properly can be reached by a "substantially related" test under DR 9–101(B)—in contrast with the total ban required by § 207(c) of the Ethics in Government Act of 1978, *supra*—are concerns about the potential misuse of government-developed information from a previous matter. Amicus' other revolving door concerns, not related to information flow, are directed at appearances attributable to government service without a demonstrable, prejudicial relationship to an earlier government transaction. The very purpose of § 207(c) of the 1978 Ethics Act is to deal with such appearances of impropriety—and the realities they may reflect—for a period of one year from leaving government, even though no related transactions are identified. As indicated earlier, we perceive no basis for incorporating that broader purpose into the more limited DR 9–101(B) proscription against participating in substantially related matters—a proscription (we emphasize again) that, unlike § 207(c), does not have a prescribed time limit, *see*

*General Motors Corporation v. City of New York*, 501 F.2d 639, 650 n. 21 (2d Cir.1974), and thus would completely shut the revolving door.

Second, the "single objective" criterion is too vague and wooden. The suggestion that, in order to constitute substantially related matters, the transactions at issue here need not all involve parking but should not be deemed related (sufficient to reflect a single objective) if the most specific common purpose is general economic development, does not take one far enough. If, for example—as we would conclude in this case, *see infra* Part III & n. 28—the most specific common purpose is general economic development of the property, that should not preclude disqualification if former government counsel did have access to information from the earlier transactions that might be useful in representing Carr.

■ In applying our own methodology, however, we do agree with amicus that when there has been a series of transactions involving the same parties, the same property, and similar (not necessarily single) objectives, the factual contexts are likely to overlap sufficiently that the party who moves for disqualification under DR 9–101(B) will have established a prima facie case, even though the technical legal issues themselves are different. *See supra* Part IIE. A look at the realistic objective of each transaction in these circumstances—a synthesis of the facts and legal objectives—will usually lead the court to conclude that an improper flow of information is likely. In the present case, for example, we are satisfied that the three land use transactions directed at the same property in the unique, relatively small CR zone, involving Oliver T. Carr and the District of Columbia government in each instance, provide a sufficient factual overlap for a reasonable person to infer that Iverson Mitchell and C. Francis Murphy, while attorneys for the District, may have had access to information from the height litigation and the air rights condominimum discussions that could be legally relevant to, or other-wise useful in, the special exception case at issue here. Accordingly, the burden of producing evidence to rebut this inference must be shifted to Mitchell and Murphy—and thus to their law firm, Wilkes & Artis.

## III.

We turn now to the BZA proceedings—first, to our scope of review and, then, to the merits.

### A.

*Scope of Review*

■ This court is to determine, as a matter of law, whether the transactions are "substantially related" and thus the same "matter." But we are bound to do so on the basis of facts found by the BZA—properly reflecting our prescribed methodology—unless they are not "supported by and in accordance with the reliable, probative, and substantial evidence." D.C.Code § 1–1509(e) (1981). "If there is substantial evidence to support the Board's finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the Board." *Spevak v. District of Columbia Alcoholic Beverage Control Board*, 407 A.2d 549, 554 (D.C.1979); *accord Haight v. District of Columbia Alcoholic Beverage Control Board*, 439 A.2d 487, 495 (D.C.1981); *see Jameson's Liquors, Inc. v. District of Columbia Alcoholic Beverage Control Board*, 384 A.2d 412, 418 (D.C.1978).

*BZA Proceedings*

The BZA properly placed the burden of persuasion on petitioner Brown, the party who moved for disqualification, and petitioner presented evidence to support his allegations that the matter before the Board was substantially related to the two earlier matters. To rebut petitioner's argument, intervenors presented seven witnesses, a number of sworn affidavits, and numerous documentary exhibits. Moreover, although petitioner has argued both to the

BZA and to this court that he was denied access to certain materials and that information relevant to his case was not placed before the Board, the record does not reflect that petitioner was improperly denied discovery of any information for which he made a timely request, or that he attempted to call any witness or introduce any evidence that was improperly excluded. Accordingly, we conclude that the factual findings of the BZA after this hearing must stand if supported by substantial evidence.

Although Oliver T. Carr's property in the West End CR Zone is the setting for each transaction, the BZA found that "[n]either the same facts, events, nor transactions were at issue in the three proceedings," and that "the issues presented by the special exception are in no way connected to the height litigation or the opinion concerning the air rights condominium." [19] The BZA, moreover, spoke directly to the "critical" concern of the "substantially related" test—as we expressed it on remand of *Brown I, supra* note 16—finding "no information present in the two earlier proceedings which would have aided the applicant in the subject [special exception] cases before the Board." Decision, January 7, 1981, *supra* note 19; *see Westinghouse Electric Corp.,* 588 F.2d at 225; *Nyquist,* 590 F.2d at 1247–48 n. 1 (Mansfield, J., concurring).

 The dissenters would discard the BZA ruling substantially because, they say, the last sentence of finding/conclusion 25 —"Nor does any common core of relevant

facts or principles render the matter identical"—applies the "wrong ultimate legal test." *Post* at 66. We disagree. In the first place, that statement does not negate the other BZA factual findings, *see supra* note 19, supported by substantial evidence, that are relevant to applying the substantially related test; at worst it is superfluous. Second, on appellate review, application of the law to the facts, using the substantially related test, is ultimately for this court, not for the BZA. The dissenters do not dispute that. Finally, it is unfair, as well as irrelevant, to fault the BZA for saying in one sentence, amidst pages of findings, that the matters at issue are not "identical." On remand, without referring to the substantially related test, this court in *Brown I,* 413 A.2d at 1282, asked the BZA to determine whether the special exception proceeding was the "same matter" as the two previous ones. In fact, we used that terminology throughout the opinion. *Id.* at 1281–84. In findings 25–27 the BZA, too, consistently used that terminology. More than likely, in reviewing our opinion and following our remand order, the BZA intended the concepts of "same" or "identical" matter to be synonymous, embracing the traditional, substantially related test that is embedded in the caselaw (cited in the division opinion) and applied here. But, even if the BZA did not apply the substantially related test, its findings are explicit enough and sufficiently supported by record evidence to permit this court to do so. In short, we perceive no basis for rejecting the BZA's factual findings be-

---

**19.** More specifically, we cite three paragraphs of the BZA's decision of January 7, 1981:

25. The Board finds that the issues presented by the special exception are in no way connected to the height litigation or the opinion concerning an air rights condominium. None of the standards which the Board was required to apply in deciding the special exception have any bearing at all on the issues which were presented by the height litigation or the air rights condominium question. Neither the same facts, events, nor transactions were at issue in the three proceedings. Nor does any common core of relevant facts or principles render the matter identical.

26. The Board finds that the fact that the same property was involved is not a sufficient connection to create an identity of issues and render the three matters as the "same matter."

27. The Board finds that the coincidental fact that the result of the decision by the Superior Court allows a larger development and thus more parking on the site is also not sufficient to create a "same matter" connection. The standards for the special exception have to be met, and the Board finds no information present in the two earlier proceedings which would have aided the applicant in the subject cases before the Board.

cause of one sentence that arguably clouds the BZA's legal conclusion—a conclusion that is ultimately for this court to make.

## B.

*The Height Litigation*

We address, first, Carr's 1975 litigation challenging the building height limitation on his West End property. *Carr v. District of Columbia Zoning Commission,* Civ. Action No. 4122–75 (1975).[20] Former Assistant Corporation Counsel Iverson Mitchell, now one of intervenor Carr's counsel, represented the Zoning Commission. Carr successfully alleged that a 60-foot height limitation imposed by the Zoning Commission on buildings in the West End within 220 feet of Rock Creek Park (as compared with the 90-foot limitation in the rest of the CR zone) was arbitrary and capricious and thus an unconstitutional taking of his property. As a result, the usable floor-area ratio (FAR) for Carr's property was increased from approximately 4.5 to 6.0, thereby permitting Carr to plan a larger building or buildings there.[21] The height litigation accordingly achieved Carr's objective of increasing the allowable rental space.

It is important to note that this litigation did not reflect or portend any particular type of development or parking arrangement. An increase in the FAR, while increasing rentable space as of right, has no direct bearing on whether the property can be developed for commercial or residential purposes. Nor, as to residential development, does an increased FAR have a direct relationship to the number of permitted parking spaces. The number of off-street residential parking spaces permitted as of right is directly related not to FAR but to the number of dwelling units—a maximum of two spaces per three units. D.C. Zoning Regs. § 4505.1 (1982).[22] An increased FAR will either permit more dwelling units of the size originally contemplated or allow the same, or even a smaller, number of units if designed to be more luxurious, and thus larger, than initially planned. Accordingly, an increased FAR bears no necessary or direct relationship to the number of parking places eventually permitted as of right—or by special exception—because FAR does not necessarily dictate the number of dwelling units.

This is not to say that an FAR increase is unlikely to result in additional dwelling units and related parking spaces; more of-

---

**20.** The BZA found that intervenors' present counsel (Wilkes & Artis) "had no role in" the height litigation. The firm of Stohlman, Beuchert, Egan and Smith, Carr's general counsel, represented Carr in both the height litigation and the air rights condominium discussion.

**21.** The floor-area ratio is a "figure which expresses the total *gross floor area* as a multiple of the area of the *lot.* This figure is determined by dividing the *gross floor area* of all *buildings* on the *lot* by the area of that *lot.*" D.C.Zoning Regs. § 1201 (1982) (emphasis in original).

The term gross floor area means "[t]he sum of the gross horizontal areas of the several floors of all buildings on the lot; ... [but] shall not include cellars." *Id.* A cellar, in turn, is defined as any area "the ceiling of which is less than four feet above the adjacent finished grade." *Id.* Thus, any below grade area with a ceiling that is less than four feet above grade will not be included in a calculation of the gross floor area and, accordingly, will not be included in the floor-area ratio or affected by restrictions on that ratio.

As applied, "[i]n the CR District the floor area ratio of all *buildings* and *structures* on a *lot* shall not exceed 6.0, not more than 3.0 of which may be used for other than residential purposes." D.C.Zoning Regs. § 4504.1 (1982) (emphasis in original).

**22.** D.C.Zoning Regs. § 4505.1 (1982) provides in relevant part:

All *buildings* and *structures* shall be provided with offstreet *parking spaces,* as specified in the following parking schedule....

| | Parking Schedule | |
|---|---|---|
| Use | Minimum Number of Spaces | Maximum Number of Spaces |
| Single family dwelling or flat | 0 | 1/dwelling unit |
| Multiple dwelling | 1/6 dwelling units | 1/3 dwelling units |
| Multiple dwelling constructed as a cooperative or condominium | 1/6 dwelling units | 2/3 dwelling units |

ten than not it probably will. The relevant point, however, is twofold. First, there is no way one can say with reasonable certainty that in 1975 the height litigation, premised only on constitutional issues, had a direct bearing on the number of dwelling units and parking spaces to which Carr would be entitled. Developmental choices were still his to make, albeit with greater flexibility after he won the lawsuit. The dissenters are simply wrong in asserting, *post* at 61, that the height litigation concerned "the Westbridge," *i.e.*, the particular residential building Carr elected to develop much later, after winning the height litigation *and* aborting a different, mixed use air rights condominium proposal for the property.

Second, additional dwelling units *automatically* permit additional parking spaces—two spaces for every three residential units added. *See supra* note 22. The question of a special exception for still more parking spaces is wholly separate from the increased number permitted as of right as the number of dwelling units increases. The dissenters overlook this point, and thus improperly tie the height litigation automatically to the later special exception proceeding, when they say that, having previously "obtained an increase of some three stories for the building, this created a related need for more parking spaces in the building." *Post* at 63; *see post* at 68. Because the height litigation did not alter the ratio of parking spaces to residential units permitted as of right, it did not create or otherwise affect the "need for more parking spaces." There is a "need for more parking spaces" by way of a special exception only if the increased number permitted as of right—as an indirect result of the height litigation—proves insufficient for the particular project eventually planned. At the time of the height litigation this additional need was anything but clear, especially because the particular development eventually built—the Westbridge—was not yet contemplated, so far as we can tell.

We elaborate these implications of the height litigation, as well as our response to the dissenters' analysis, to show that, in the absence of evidence—and there is none—that Mitchell may have been privy to information somehow relating it to Carr's specific plans for the property and the District's likely response, it does not appear that increasing the FAR would have had any relationship to a later special exception case concerning off-street parking at a development eventually planned for the same property. The BZA found no such relationship following remand of *Brown I:* "Nothing in the record herein demonstrates that any of the issues in the height litigation related to the subject of parking." Findings ¶ 8. The BZA emphasized that "[t]he sole issue was the sixty foot height restriction and there was no reference to parking issues." Findings ¶ 9. Most significantly, the BZA found that "no information" available to Mitchell from the height litigation "would have aided" Carr in the special exception case. Findings ¶ 27, *supra* note 19.[23]

---

**23.** In response to the concern about government attorneys looking ahead to private employment, the BZA added that it could not find "the litigation was not vigorously defended by the Corporation Counsel." Findings ¶ 19. The record confirms that Mitchell capably conducted the District's litigation effort. He defended the height limitation on the basis of the record developed before the Zoning Commission. He testified before the BZA that this strategy was consistent with the Corporation Counsel's position "that the record must stand on itself, that the Court could not substitute its judgment for that of the Zoning Commission." In the BZA proceeding, petitioner introduced no evidence to contradict Mitchell's assertion that this was official Corporation Counsel policy; nor did petitioner introduce any other evidence to suggest that Mitchell was anything but zealous in his representation of the District of Columbia's interests. Moreover, there is no possibility that Mitchell improperly diverted public funds for private gain. *See General Motors Corp. v. City of New York,* 501 F.2d 639, 650 (2d Cir.1974); *Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago,* 283 F.Supp. 464, 469 (D.Minn.1968), *aff'd,* 408 F.2d 1099 (8th Cir.), *cert. denied,* 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73 (1969). The government's position in the height litigation was wholly defensive.

We see no basis for disturbing these findings; they are supported by substantial evidence. The record shows that the Zoning Commission imposed the height limitation on buildings adjacent to Rock Creek Park for aesthetic reasons, not because of a desire to limit traffic and related parking. The record also shows that, as a result of the trial court's striking the height limitation, Carr was entitled to an increased FAR. But the record amply supports the BZA's finding that the effect of the litigation on the eventual number of dwelling units and related parking spaces—as we elaborated above—was indirect and thus "coincidental." Findings ¶ 27, *supra* note 19. Furthermore, in view of the fact that Carr proffered a mixed use air rights condominium proposal to the District government a few months after the height litigation, it is extremely unlikely that at the time of the height litigation Mitchell could have been privy to information about Carr's eventual, wholly residential project in the West End: the Westbridge.

*The Air Rights Condominium Proposal*

Next, is the air rights condominium proposal. The October 24, 1975 letter from Carr's attorney at that time, *see supra* note 20, to then Corporation Counsel Francis Murphy (now with Wilkes & Artis) read in relevant part as follows:

Dear Mr. Murphy:

Our firm represents Oliver T. Carr, Jr., who desires to develop the Sealtest Dairy Site at 26th and Pennsylvania Avenue, N.W. for residential, commercial and office uses under the new CR zoning. On October 21, 1975, representatives of Mr. Carr had a preliminary discussion with regard to the proposed development with Messrs. Louis Robbins, Iverson Mitchell, and Semi Feuer of your office, together with Messrs. Kirk White and Steve Sher of the Municipal Planning Office to acquaint them with the proposed development and mixed uses, and to request an opinion from the Corporation Counsel that the building complies with the new CR Zoning Regulations and Condominiums Laws of the District of Columbia. The purpose of this letter is to formally request such an opinion from the Corporation Counsel and to outline the facts involved....

It is our opinion that since we are building one building on one lot and the legal title is in one ownership that the proposed building meets all of the requirements of the CR zoning. More particularly, (i) that no rear yard is required since the building fronts on three streets, 26th, Pennsylvania Avenue, and M Streets; (ii) that the provision of private recreation space required for residential use is met by the provision of recreational space for the use of condominium owners over the roof of the first floor parking and retail areas; and (iii) *parking limitations are met because the sum total of spaces do not exceed the maximum permitted for the uses contemplated.* It is also our opinion that the building will continue to satisfy CR zoning requirements when condominium declaration is filed because of the covenants and easements described below. [Emphasis added.]

We would appreciate an opinion confirming that the proposed project does meet the CR zoning requirements conceptually, contingent upon the actual amount of various kinds of space being adequate and verified. In the event there is any problem, of which we are not aware, we would appreciate it if you would contact us so that we may attempt to resolve the problem.

In the first place, unlike the height litigation, the air rights condominium proposal would not have affected the amount of rentable space and related parking places permitted as of right after the height litigation. The FAR restrictions on rentable space, *see supra* note 21, as well as the zoning regulations applicable to parking, *see supra* note 22, for a building constructed on air rights do not differ from those applicable to a building owned in fee simple.

Furthermore, two witnesses testified without contradiction that parking in no way was at issue in the air rights condominium proposal. William Smith, the author of the letter and Carr's trial counsel in the height litigation, *see supra* note 20, testified at the BZA hearing, explaining the reference to parking as follows: "I was saying that in our opinion, this building, this concept we had, would meet all the CR zoning requirements. Therefore, assuming that we met the zoning requirements, they were to go ahead and give us an Opinion as to whether or not an air rights condominium would be legal under the then-existing condominium statute. That was the only reason I referred to the parking." Robert Carr, a vice president of the developer, explained the reference in these terms: "I don't think there was any definition then of the precise number of parking spaces that were to be utilized by either the commercial or residential uses. I think that all this says is that it was the intention of the firm to comply with the parking levels set for zoning."

The BZA, which had the opportunity to observe the witnesses, accepted this explanation, finding that "[t]he October meeting and letter dealt solely with the concept of an air rights condominium. Neither the meeting nor the letter dealt with or had any relation to parking.... Parking was not an issue in ... the condominium question." We see no other plausible interpretation to give the words of the letter, and petitioner has offered none.[24] Nor do we perceive any basis for upsetting the BZA's finding that no information available to Murphy and Mitchell at the time of this transaction would have aided Carr in the special exception case. Decision, January 7, 1981, *supra* note 19.

*The Special Exception for Additional Parking*

There is, finally, the present case: an application for a special exception to permit additional, below grade parking spaces for the Westbridge residential development Carr eventually built. As noted earlier, CR zoning regulations require a developer to provide a minimum of one parking space for every six dwelling units and permit the developer to provide a maximum of two spaces for every three units. D.C. Zoning Regs. § 4505.1 (1982), *supra* note 22. The BZA may grant a special exception, permitting parking in excess of the maximum, if: (1) the proposed parking is indoor, *id.*, § 4502.321; (2) the entrances and exits to the parking spaces are not within 25 feet of a street intersection or within 12 feet from the center line of an alley, *id.*, §§ 4502.322, 7402.12; (3) "[s]uch parking shall not result in dangerous or otherwise objectionable traffic conditions, and the present character and future development of the neighborhood will not be adversely affected," *id.*, § 4502.323; and (4) "[s]uch parking is reasonably necessary and convenient to uses on the same lot or in the vicinity." *Id.* § 4502.324.[25]

The application before the BZA would allow Carr to add 45 below-grade parking spaces to the West End development, creating a one-to-one ratio of spaces and dwelling units. Unlike the height litigation with the resulting increase in FAR, the special exception proceeding cannot be characterized as an attempt to increase the rentable space on Carr's property. The FAR regulations do not restrict the amount of rentable space that may be added to a building below grade, *see supra* note 21; a builder may add as much space below grade as he or she chooses. Thus, the parking space exception, if granted, would not have affected the amount of rentable space avail-

---

24. Moreover, there is nothing in the record to suggest that the number of dwellings and related parking spaces in the proposed air rights condominium would have been greater or fewer than the number in the Westbridge development that Carr ultimately constructed.

25. The regulations also require the BZA to refer the application to the District of Columbia Municipal Planning Office "for coordination, review and report" before taking final action. D.C.Zoning Regs. § 4502.325.

able at the Westbridge; it only would have authorized Carr to use more of his rentable space below grade for parking.

On remand of *Brown I*, the BZA found the regulations' criteria satisfied and granted the application in its order of May 17, 1978, concluding that additional below grade parking would ameliorate traffic conditions in the vicinity of the Westbridge.[26] As noted earlier, *see supra* note 19, the BZA expressly found that no facts or issues in this special exception case were in any way connected with the earlier building height and air rights condominium transactions, and that no information which may have been available to Mitchell and Murphy from these previous transactions would have aided Carr in the special exception case. Given the decidedly different legal issues in each transaction and the testimony and exhibits of record as to each, we conclude that substantial evidence of record supports these findings.

*Summary*

Although the height litigation facilitated an increase of rentable space, indirectly permitting construction of a building with a larger number of dwelling units and related parking spaces than Carr otherwise probably would have planned, the maximum number of parking spaces remained fixed by the zoning regulations at a ratio of two spaces for every three units. Thus, the height litigation was not related to Carr's later objective, announced in the special exception proceeding, of obtaining one parking space per residential unit. Nor was the aborted mixed use air rights condominium proposal—which pertained neither to the amount of rentable space nor to parking—in any way related to Carr's application for an increase in off-street parking at the later-conceived, residential Westbridge development. Finally, because the special exception case concerned only parking, it was not related to Carr's earlier objectives of increasing rentable space through the height litigation and seeking an opinion on the legality of an air rights condominium in the CR zone.

The dissenters reject this analysis primarily because of a faulty premise: that all three matters—height litigation, air rights condominium proposal, and special exception case—concerned the "same building (the Westbridge)." *Post* at 61; *see post* at 61, 63, 66, 68. That is plainly not true, as the dissent itself acknowledges in two footnotes. *Post* at 61 n. 4, 66 n. 12. The same property is involved, but we have no evidence that the Westbridge, and Carr's desire to maximize the number of parking spaces there, was in any way related to the two earlier proceedings. Indeed, the intervening air rights condominium proposal is clear evidence that the Westbridge, as such, was not involved in the two earlier proceedings. In short, the dissenters posit "an uncomplicated case," *post* at 61, that mischaracterizes what happened [27] and then proceed to

---

**26.** In particular, the BZA found:

13. The requested parking will be used as storage parking for the owners of the proposed condominium units to be erected as a part of the development project. The spaces will not be utilized by either commuters or others who wish to avail themselves of commercial parking in an intown area.

14. The applicant's traffic expert testified and the Board finds that the proposed parking will not generate many trips or significantly increase traffic because of its nature as storage parking for residents of the building.

15. Parking provided at the ratio of one space per dwelling unit will keep the automobiles owned by the resident occupants of the proposed building off adjacent community streets and off other parking lots in the area,

thereby diminishing traffic impact in the vicinity of the proposed building.

**27.** The dissent states, *post* at 61:

Two attorneys were involved while in government with problems and litigation related to the construction of a building (the Westbridge) in the "West End" of Washington, D.C. Later, they both joined a law firm and proceeded to represent *the same property owner*, Mr. Carr, in a proceeding involving *the same property* and *the same building*[4] in its final stages of construction.

[4] By "same building" I mean the building constructed on the same site....

This characterization of the facts has two obvious flaws: (1) The two former government attorneys, Murphy and Mitchell, were never in-

attack the majority opinion for not dealing, in effect, with the dissenters' own hypothetical set of facts.

## IV.

We conclude that the BZA analysis is correct: Carr's application to the BZA for a special exception for additional, below grade parking at the residential Westbridge development—a matter not increasing rentable space—is not substantially related, within the meaning of DR 9–101(B), to (1) the earlier discussion/correspondence about a mixed use air rights condominium proposal on the same property (which did not concern rentable space or parking), or (2) the earlier height litigation establishing on constitutional grounds increased FAR, and thus more rentable space, on the same property—with no direct relationship to permitted off-street parking.[28]

Some members of the general public, not attuned to the revolving door debate, may wonder why former government attorneys—who negotiated or litigated with a developer on behalf of the public in the implementation of a novel zoning district—should be permitted, after leaving the government, to bring their expertise to that developer as his lawyers for the continuing effort to exploit that zoning for private gain. We believe, however, that properly informed of the countervailing concerns, the public would find the revolving door rules—protecting against prejudicial use of government information—palatable. While it presumably is true that other attorneys in the developer's law firm could have handled the special exception case, with the

former government attorneys properly "screened," DR 9–102, we have resolved that, for matters not substantially related to previous representation of the government, such insulation is not necessary. This court should expect no more than what the rules require. On this record, the revolving door rules permit Wilkes & Artis to represent intervenors in this case.

*Affirmed.*

PRYOR, Chief Judge, concurring:

The ethical issue presented here arises not from a breach of confidentiality born of a conflict of interest, but from the possibility that an attorney may wield governmental authority with a view to subsequent private gain. To avoid even the appearance of such impropriety, the Code of Professional Responsibility directs the former government attorney to refuse private employment in matters for which he had substantial responsibility as a public servant. DR 9–101(B). *See generally* EC 9–3, "Revolving Door," 445 A.2d 615 (D.C.1982) (en banc) (per curiam).

In affirming the ruling of the Board of Zoning Adjustment, the majority opinion employs a comprehensive analysis of several of the canons related to the one at issue. Given our limited experience in this area, I am more cautious. In the context of this case, I am confident that the height litigation and discussions concerning the proposed air rights condominium, are not sufficiently related to Carr's efforts to increase available off-street parking to constitute the same "matter" within the mean-

---

volved with the Westbridge while in government; that particular project was initiated after they left. (2) The reference to "the same property and the same building in its final stages of construction" is plainly wrong. The Westbridge building is wholly separate from, and came altogether after, the aborted air rights condominium proposal. There simply was no building inherent in the air rights proposal, let alone in the earlier height litigation, with which the Westbridge can be equated and thus called the "same." *See post* at 66 n. 12. Accordingly, the dissenters really proffer a twofold "same

property owner/same property" test, not a threefold test.

28. Clearly, the most specific single objective that embraces all three transactions is the general economic development of Carr's West End property—not enough under amicus' formulation to constitute disqualification under DR 9–101(B). More properly characterized, there are three, unrelated objectives: increased rentable space (height litigation), the legality of air rights ownership in the CR zone (mixed use condominium proposal), and increased off-street parking (special exception application).

ing of DR 9–101(B). *See Committee for Washington's Riverfront Parks v. Thompson*, 451 A.2d 1177 (D.C.1982).

In sum, without requiring the proof of a specific violation which the majority opinion seems to imply, I vote to affirm.

Dissenting opinion by GALLAGHER, Associate Judge, Retired, with whom NEBEKER, Associate Judge, and KERN, Associate Judge, Retired, join:

In this irresolute decision, the court repulses our Bar in its earnest effort to establish in the District of Columbia an uplifting standard of legal ethics on "changing sides" by former government lawyers who later enter private practice ("revolving door"). In a backward-looking opinion, our Bar is here being told in so many words that it is seeking for itself a higher standard of ethics than the court is willing to abide. Particularly in these days of recurring public criticism of the legal profession, I would have thought this court would be entirely willing to support the Bar in its commendable effort.[1]

Before I discuss the two major errors in the court's opinion, I will set out in very summary fashion the protracted history of this case.

When it first came to us (*Brown I*),[2] the Board of Zoning Adjustment ("the BZA" or "the Agency") had denied a request to disqualify the law firm under the Canon of Legal Ethics here being considered. The Chairman of the BZA, speaking for the Board stated:

I do not know if the Board has the authority or ability to even judge these things. Clearly the place to judge a conflict of interest or a violation of any disciplinary rules of the Bar Association or what have you would be with the Bar Association itself. I suspect ... that if you had a question of that kind, the proper forum would be whatever disciplinary Board you might have in the Bar Association.

It seems to me we are taking our jurisdiction a bit far when we try to interpose our interpretation of what the disciplinary rules of the Bar Association provide and whether this is in conflict with that or not. We have enough problems right now in trying to interpret these [zoning] Regulations.

Actually, the agency did have the initial authority and the responsibility for the integrity of its proceedings, and so we remanded for further proceedings. *Brown I, supra*, 413 A.2d at 1285.[3] I do agree, however, with one implication of the Chairman's ruling. I agree that it is the ultimate responsibility of this court—aided by our Bar—to establish the standard of legal ethics in the District of Columbia. We should not shun this responsibility in the guise of applying the often stated rule in administrative law that agency findings of fact must be accepted by the reviewing

---

**1.** The Committee on Legal Ethics of the District of Columbia Bar is here referred to as "the Bar." The Committee is the Bar's representative on matters of legal ethics. It is precisely for this reason that the court requested it to brief and orally argue this case as amicus.

Like in other Bars, the Committee issues published opinions at the request of Bar members on problems of legal ethics. *See* ABA/BNA Lawyers Manual on Professional Conduct, § 81–2301 *et seq.;* Code of Professional Responsibility and Opinions of D.C. Bar Legal Ethics Committee. Though not binding, courts view such opinions as authoritative. Nationally, the American Bar Association's Legal Ethics Committee opinions are widely cited by the courts.

I am not entirely clear on whether the statement in the first footnote of the majority opin-

ion has a contrary implication. As will be apparent, the Committee (the Bar) is in fundamental disagreement with the court in this case on how legal ethics should be viewed in this jurisdiction as it applies to former government attorneys.

**2.** *Brown v. District of Columbia Board of Zoning Adjustment,* 413 A.2d 1276 (D.C.1980).

**3.** In remanding, we took the extraordinary step of offering some advance suggestions in the legal ethics area due to the protestation of the BZA that the agency was inexperienced in this area. This was done to point the agency toward some potential questions that might arise on remand. We of course were not deciding any issues in advance.

court if supported by substantial evidence. I will go into this later.

After the remand proceedings, the BZA made findings of fact and conclusions of law in major respects that strain one's credulity, and the case came back to this court. After a decision by the hearing division reversing the BZA decision, the court went *en banc* in this case and the issues became sharpened for the establishment by the full court of the governing law on "revolving door" in this jurisdiction. The court on its own motion requested the Bar, through its Committee on Legal Ethics, to file a brief and orally argue as amicus curiae. It is fair to say that this is a seminal decision on this issue.

Basically, this is an uncomplicated case if one stays with reality and simple fundamentals. In explaining the case, I see no need to get lost in the woods of the majority opinion.

Two attorneys were involved while in government with problems and litigation related to the construction of a building (the Westbridge) in the "West End" of Washington, D.C. Later, they both joined a law firm and proceeded to represent *the same property owner*, Mr. Carr, in a proceeding involving *the same property* and *the same building* [4] in its final stages of construction. In all instances, the proceedings specifically involved increasing the density of space in the building for marketing purposes. The first proceeding involved increasing the density of space for marketing purposes by raising the building height from 60 to 90 feet. The present proceeding involves increasing space density for marketing in the lower end of the building (for parking). Earlier the space density increase for marketing was for upstairs in the building and this time it is for downstairs in the same building (the Westbridge). The main question of law is whether, for the purpose of this proceeding, there constituted a "substantial relationship" between the first proceeding to increase density for marketing space upstairs and the present proceeding to increase density of space for marketing downstairs in the very same building owned by the very same party. The BZA enters findings that are defective, as I shall demonstrate, and then concludes that the earlier transactions were *"in no way connected"*[5] with the current BZA proceeding concerning increased parking, a fatal error in its ultimate finding of fact.

Before discussing the evidentiary and legal issues before the court, it might be well to outline (1) what the function of the BZA was; (2) what the Code of Professional Responsibility provides and its rationale; (3) how the Board did and did not perform its proper function; and (4) what is now before us for review.

The facts in this case, as I say, actually are not complicated. Mr. Carr decided several years ago to build a project in the "West End" section of the District of Columbia with the geographical focal point being 24th and Pennsylvania Avenue, N.W.

The court's treatment of the "same building" question—and its emphasis on a non-existent air rights condominium—is an excellent illustration of the wisdom of the Bar's suggestion that we not engage in "fine ratiocinations" in this case.

---

**4.** By "same building" I mean the building constructed on the same site.

This is not a corporate tax case where form and technicalities predominate. We have here a down to earth ethical question. For our purposes, there need not be the same number of restrooms, or water fountains, or elevators, *or parking spaces* to be the "same building." Contrary to the court's opinion at footnote 2, the two attorneys were in fact government attorneys when the height of the Westbridge (to be built) was raised by three stories as a result of litigation. The fact is that Mr. Mitchell represented the government in that litigation—contrary to the majority's representation that the "project was initiated after they left."

**5.** BZA Findings, paragraph 25 (emphasis added). As will appear, this test, which the BZA applied, is manifestly erroneous as a matter of law. This alone requires reversal under the well known rule of *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The rule of *Chenery* is one of the landmarks in the law on administrative procedure.

62

At that time, the building height limitation there was 60 feet rather than the usual 90 feet, due to its proximity to Rock Creek Park. Mr. Carr decided to institute a legal proceeding to get the height limit raised from 60 to 90 feet, adding extra stories to the building. He instituted an equitable proceeding for this purpose and was successful in adding the extra stories to the building for marketing. Later, there were additional discussions with then Corporation Counsel C. Francis Murphy about a proposed air-rights condominium on the same site but this proposal was soon dropped because of the Corporation Counsel's unfavorable reaction on the proposal's chance for success, among other things. It is of significance in this case that the Corporation Counsel, from whose office the two attorneys here involved emanated, is legal advisor to the BZA, among other district agencies. As a matter of fact, in the remand proceeding before the BZA, the official presence of an Assistant Corporation Counsel, presumably in the advisory capacity of that office, is noted on the record. The record is silent as to whether the Assistant Corporation Counsel also assisted in the preparation of the BZA's findings of fact in this proceeding.

According to correspondence presented to the Board through petitioners' motion to reopen the hearing, in advance of formal application of the project plan, Carr's attorneys met with Corporation Counsel Murphy. Wilkes and Artis represented Carr in the early Westbridge development proceedings primarily through senior partner Norman Glasgow, Sr. Two letters, dated May 24, 1973, and June 27, 1973, and written on Carr's behalf to a company apparently then negotiating sale of specific West End property to Carr, describe various contacts between Glasgow and Murphy. Relevant portions are excerpted:

Mr. Glasgow states that it is absolutely necessary to clear the application with Corporation Counsel C. Francis Murphy, prior to filing the application, and he hopes to discuss this with Mr. Murphy next week. Even if Mr. Murphy has no

suggested changes and the application is then filed promptly, and even if no opposition develops, Mr. Glasgow believes that it will take the Zoning Commission longer than November 1, to approve the zoning application.... Moreover, he does suspect that Mr. Murphy will have some proposed changes and will want to study the proposed zoning application before letting him know what those changes are.

\* \* \* \* \* \*

After several attempts I [another Carr attorney] was able to contact Norman Glasgow by telephone. He stated that on June 8th, 1973, he had a meeting with the Corporation Counsel, C. Francis Murphy, to discuss the zoning proposal in advance of the formal application. As a result of the meeting, Mr. Glasgow is no more optimistic than he was at last report—that is, he does not think it is possible to obtain this zoning by the November 1st, 1973, deadline.

As I understand the conversation, Mr. Glasgow and Mr. Murphy discussed four approaches to obtaining this new zoning. Only two of the approaches seemed to be feasible. Of these two, one of them requires Mr. Glasgow to research legislative history to determine whether Congress will permit the zoning contemplated. Perhaps we could be of some assistance to him in this research.

The other approach involving redefining a highway, thereby changing the definition of a building setback line. Mr. Murphy encouraged Mr. Glasgow to pursue this method.

Also filed with the BZA on the same day, was an April 1, 1974, memorandum from Murphy to Martin Klauber, Executive Secretary of the Zoning Commission. The memorandum states that Murphy had reviewed Carr's application and concluded that it should be processed as a petition to amend the text of zoning regulations,

thereby hastening Zoning Commission review.[6]

The Zoning Commission eventually adopted a text and map designating the West End section as a Mixed Use, CR zone district, the purpose of which is to encourage a diversity of compatible land uses, including residential, office, retail, recreational and light industrial. D.C.Zoning Reg. § 4501.1 (1982) (codified as amended at 11 DCMR § 600 (1984)). Additionally, the plan seeks to reduce the flow of traffic and develop areas devoted primarily to pedestrians. *Id.* These objectives are accomplished in part by prescribing the necessary minimum and maximum numbers of parking spaces for commercial and residential development through a floor area ratio (FAR) formula based upon bulk square footage and residential units. *Id.* at §§ 4504 *et seq.* (codified as amended at 11 DCMR § 631 *et seq.* (1984)).

Having later obtained an increase of some three stories for the building, this created a related need for more parking spaces in the building. Consequently, the present proceeding before the BZA was instituted, which tied the added living space to the closely related need for added parking space.

During the period of the previous proceedings, Mr. C. Francis Murphy was Corporation Counsel of the District of Columbia and took part in conferences concerning various phases of the building project over the years on behalf of the government. Mr. Iverson Mitchell was at the same time an Assistant Corporation Counsel and represented the District in the proceeding brought by Carr to raise the building height limitation. No appeal from the successful suit by Carr was instituted by the

District.[7] Both of these lawyers, by then in the private law firm, represented the very same party, Mr. Carr, in the present BZA proceeding.

On remand, it was for the BZA to hold a hearing and make factual findings and conclusions on whether Canon 9 of the Code of Professional Responsibility was violated, and, therefore, whether there must be a removal of the law firm from the proceeding before the BZA for failure by the law firm to screen out these two former government attorneys from the BZA special exception proceeding and to substitute other attorneys of the law firm.

The pertinent ethical consideration in Canon 9 provides:

> After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists. Code of Professional Responsibility EC 9–3 (1983).

These concerns evolved from years of controversy about the "Revolving Door" in this jurisdiction. As one might well imagine, this has a special sensitivity in Washington, D.C., being, as it is, the seat of government. Most law firms here continually hire or make partners of former government attorneys to gain their expertise and experience and government contacts. Any disciplinary rule which potentially might impinge upon this flow of experienced legal talent to private practice understandably would send tremors through the top levels of local law firms.

---

**6.** The Board considered this evidence prior to its decision on remand and assumed that these discussions had in fact taken place:

Wilkes and Artis, principally through Norman M. Glasgow, Sr., represented Oliver T. Carr during the period of time that the CR zoning was before the Zoning Commission in 1973 and 1974. The opposition alleged that while so representing Carr, Mr. Glasgow met with Mr. Murphy during 1973 and 1974, who gave

advice and consultation to Mr. Glasgow on how best to obtain approval of the CR Zone from the Zoning Commission. The Board finds that, even assuming those contacts, there is no relationship, factual or legal, between the public hearings on the CR zoning issues and the [proceeding involved here].

**7.** I do not imply one way or the other that an appeal should or should not have been taken.

Some years ago, a committee of our Bar was pushing for a relatively stern rule regarding the "Revolving Door."[8] It had the potential to disqualify law firms from some federal cases, rather than just individual attorneys of the firms. This movement eventually receded, however, with the present amended rule eventuating. The rule is pointed toward screening by a law firm of a disqualified firm member but leaving the firm itself unaffected, *i.e.,* the firm remains in the case. The outcome is a comparatively mild restriction on participation in specific proceedings by former government attorneys. As the court states, if attorneys in law firms formerly participated while in the government in any proceeding "substantially related" to the proceeding in which the law firm is then engaged, any such attorney should be screened by the firm from any participation in the current proceeding. It is a moderate, sensible approach to the ethical problem and usually creates only a relatively minor inconvenience for the firm.

There have been, however, misconceptions about this disciplinary rule. There has been misunderstanding that the Canon somehow impinges upon the ability of former government attorneys to practice their governmental specialty when later in private practice. This is grossly inaccurate. By no stretch of the imagination does this rule, for example, interfere with the opportunity of a former government tax attorney to practice tax law in private practice. All that DR 9-101(B) does is restrict the former government tax attorney from later representing a private client in *any matter* which is "substantially related" to a *matter* (case or transaction) for which the attorney had substantial responsibility while a government attorney. Unless one has no sense at all of legal ethics and governmental integrity, this is a perfectly reasonable and workable restriction. This is as far as

it goes. Because of the moderate screening provision—with the law firm remaining in the particular case—there is no interference with the governmental hiring program due to future economic inhibitions on attorneys considering government employment. The screening provision removes any such problem. In other words, there is in place in this jurisdiction a moderate, sensible approach to the ethical question covered in Canon 9. There is no good reason why this court should not stand behind this Canon and enforce it, as it was intended, especially since it is the court's own rule. Unless it is enforced in a proper case, it might better not be "on the books."

### FINDINGS OF FACT

In turning to our scope of review in this case, the court's opinion states it is for the court *"to determine, as a matter of law, whether the transactions are 'substantially related' and thus the same 'matter.'"* But, says the court, "we are bound to do so on the basis of facts found by the BZA ... unless they are not 'supported by and in accordance with the reliable, probative, and substantial evidence.'"

I should have thought it was for the administrative agency to first make a determination on whether the transactions are "substantially related and [therefore] ... the same matter." I had thought that was the fundamental purpose of the remand proceeding before the agency. That is essentially why administrative agencies are created.[9]

The court shields the fact that in its decision the BZA did not so much as once mention the term "substantially related," let alone apply it, even though the court correctly says it is the "ultimate test" in this case. So the BZA never evaluated the evidence from the correct legal standpoint.

---

**8.** *"Revolving Door,"* 445 A.2d 615 (D.C.1982) (en banc) (per curiam).

**9.** It is true that this court should ultimately reach its own judgment on matters of law relat-

ing to construction of the court's own rules on legal ethics. It is hardly for an administrative agency to bind the court on the meaning of the court's own rules.

This is a fatal error, without more. *SEC v. Chenery Corp., supra.*

Turning to the court's statement that the court should consider itself bound on "facts found by the BZA if supported by substantial evidence," this of course presupposes that the findings are not clearly wrong or based upon a fundamental misunderstanding of its fact-finding mission in the case, both of which would prevent its findings from being supported by "substantial evidence." Especially when the agency is breaking new ground, we should pay unusually careful attention to the findings of fact to insure that the agency understands what is significant in reaching its ultimate findings of fact. Otherwise, the ultimate findings are likely to be wrong. That is what happened in this case. But the court simply overlooks the erroneous findings.

### A.

The significant findings of the BZA are essentially contained in four paragraphs of its ultimate findings. They follow:

24. The Board finds that the application before the Board was for a special exception brought under the provisions of Paragraph 4502.32 and Subsection 8207.2 of the Zoning Regulations. As such, the Board's jurisdiction is limited to determining whether the applicants demonstrated that they met the requirement of those portions of the Regulations.

25. The Board finds that the issues presented by the special exception are in no way connected to the height litigation or the opinion concerning an air rights condominium. None of the standards which the Board was required to apply in deciding the special exception have any bearing at all on the issues to [sic] which were presented by the height litigation or the air rights condominium question.

Neither the same facts, events, nor transactions were at issue in the three proceedings. Nor does any common core of relevant facts or principles render the matter identical.

26. The Board finds that the fact that the same property was involved is not a sufficient connection to create an identity of issues and render the three matters as the "same matter."

27. The Board finds that the coincidental fact that the result of the decision by the Superior Court allows a larger development and thus more parking on the site is also not sufficient to create a "same matter" connection. The standards for the special exception have to be met, and the Board finds no information present in the two earlier proceedings which would have aided the applicant in the subject cases before the Board.

Our job is to scrutinize those findings, not just read them, and first determine whether they make sense on the surface.[10] It is readily apparent that the Board's fact finding is unacceptable if there is to be a serious appellate review. A brief analysis of the findings will now follow.

In the first paragraph of the material findings of fact[11] (Paragraph 24), the Board simply finds that in the present proceeding before the BZA, the Board was confined to a determination of whether the requirements of two Board regulations were met. There is no doubt about this, and it is simply a preliminary statement.

In the second paragraph of findings (Paragraph 25), the Board finds that the first proceeding to raise the height of the building and the earlier aborted plan to obtain zoning for air rights condominium contained different issues; and that they involved different standards. There is no

---

**10.** The review is made difficult by the manner in which the Board's decision is constructed. Findings of fact are interspersed with legal conclusions and are not segregated for review purposes. However, we must take them as we find them in this already protracted case, even though it makes review more difficult.

**11.** As I have indicated, while the decision contains several pages the material findings of fact are found in Paragraphs 24 through 27, inclusive.

doubt about the accuracy of these two findings either. The materiality of it is another matter. But the ensuing findings in Paragraph 25 begin to take on more significance. The next two major findings are these:

> Neither the *same facts, events, nor transactions were at issue* in the three proceedings. Nor does any *common core of relevant facts* or principles *render the matter identical.* (Paragraph 25; emphasis added.)

First of all, as the court's opinion acknowledges, there is no requirement of law that the "matter" must be found to be "identical," as the Board says. The BZA's application of a standard requiring strict identity of issues was a serious error that demonstrated a fatal misunderstanding of the appropriate ethical standard, a standard that only requires a party seeking disqualification to prove that prior and present representations are *substantially related. T.C. Theatre Corp. v. Warner Brothers Pictures, Inc.,* 113 F.Supp. 265, 268 (S.D.N.Y.1953); *see also Trone v. Smith,* 621 F.2d 994, 1000 (9th Cir.1980) (substantial relationship test does not require the issues in two representations to be identical). There is no dispute whatsoever in the court in this case on this point, *viz.,* that "substantially related" is the legal test for application in this case.

Nowhere, at any time, does the Board in its findings so much as even mention the term "substantially related," let alone apply it as the ultimate test as it was legally required to do. It was because, realistically, it was likely that the appellate court would only rarely encounter ethical problems where "identical matters" were involved that the "substantially related" test was created so as to give the rule actual significance. Having applied the wrong ultimate legal test in this case, *viz.,* the "identical" standard, the agency, without more, committed another major and revers-

ible error of law in its decision. *See SEC v. Chenery Corp., supra,* 318 U.S. at 94, 63 S.Ct. at 462.

Returning to that finding (Paragraph 25), the BZA found there was an absence of the "same facts, events [and] transactions ... at issue in the three proceedings. Nor does any common core of relevant facts or principles render the matter identical."

An appellate court seriously reviewing that finding would have to question whether the BZA could in all seriousness conclude it was not a "relevant fact" that Carr was the same party at all times, and there were involved at all times the same property, the same building, to say nothing of the same specific purpose. Yet, the agency incredibly found there was no "common core of relevant facts." In a case involving a real estate transaction, there can be no more important core of facts than "same party, same property, same building,[12] same specific purpose" in all the pertinent transactions. Even the majority opinion in this case concludes there was an important "factual overlap" in the pertinent proceedings. (Majority opinion at 30.) This surely has to be taken as a frontal rejection by the court of the BZA's finding that there was not a common core of facts. This made reversal mandatory, yet, in its conclusion, the court blithely contradicts itself by stating that there is substantial evidence to support the BZA's finding that the facts and issues were not "in any way connected." That could not be. This is an obstinate neglect of the court's review responsibility.

The Board next finds that "the fact that the same property was involved is *not a sufficient connection to create an identity of issues and render the three matters as 'the same matter.'* " (Paragraph 26; emphasis added.) Here are two major errors in the same finding. First, there

---

**12.** Naturally, in referring to "same building" it is not intended that it was the same identical building, in all respects.

is obviously no issue as to whether the fact that the same property was involved is, *by itself,* sufficient to create an "identity of issues" rendering the three matters the "same matter." Secondly, the Board does not comprehend the question. The question is whether the presence of the "same property" is a factor of material significance—not whether it is "a sufficient connection to create an identity of issues and render the three matters as the 'same matter.'" Furthermore, nowhere does the BZA make an affirmative finding concerning the fact that there was always the same party (the most important single connection).

The next and final paragraph of findings (Paragraph 27) is an eye-opener:

> The Board finds that the *coincidental fact* that the result of the decision by the Superior Court *allows a larger development* and *thus more parking on the site is also not sufficient to create a "same matter" connection.* ... (Emphasis added.)

This finding reveals a devastating misconception by the Board of its fact-finding mission in this case. Yet, the court does not deal with this defective major finding of fact.

To begin with, the Board was there referring to the equity action brought by the developer (Carr) in the Superior Court to raise the building height from 60 feet to 90 feet, which if successful, would inevitably provide a strong basis for securing an increase in the number of parking spaces needed. The Board finds that this "coincidental fact" provides no basis to infer a "same matter" connection. In the defensive posture which permeates the BZA findings in this case, no evidence of material significance ever strikes the Board as a "connection" on the "same matter issue."[13] But let us consider what this finding actually says and what it reveals to an appel-

late court bent on a workman-like review in this administrative case.

Here is a developer (Carr) planning a development for profit. This particular preliminary effort in court succeeded in raising the height of the proposed building from 60 feet to 90 feet—resulting in three more stories on this building. Here we have the sophisticated BZA concluding it is a "coincidental fact" that this successful litigation "allows a larger development" and "thus more parking." The developer was not in court for an intellectual exercise to prove the city agency was "arbitrary and capricious" in restricting the building to 60 feet in height. The developer went to court to increase the profitability of the proposed building by obtaining more marketable space. It was scarcely "coincidental" that the result allowed "a larger development." That was the reason for instituting the proceeding.

But what this finding reveals goes to the root of the multiple reversible errors in this case. The BZA misconceived its fact-finding function in this case because it manifestly did not understand what it was supposed to be looking for. Legal ethical problems stem from matters of economics not intellectual exercises. In cases where lawyers are found to have "switched sides" unethically, it was not done primarily for the sake of winning a legal argument, though this may have been a necessary step. Almost invariably, it was essentially rooted in a financial reason—for the law firm and for the lawyer. Ethical problems normally arise from conduct arising out of monetary incentives.

A review of the BZA findings in this case shows a serious lack of understanding of the ethical question. From all that appears, the Board did not understand that the lack of the same legal issues in the injunction proceeding in Superior Court and the special exception for parking proceeding in the BZA was by no means control-

---

**13.** Still again, there is no indication of the Board's awareness that "substantially related" is the ultimate test as a matter of law.

ling.[14] The Board ignored the crucial fact that it was the same party seeking at all times to increase the density of marketable space in the same building on the same property—the economic factors—and consequently neglected to make affirmative findings on these factors.

If, for example, Attorney A represented the government in a trial of Corporation X for violation of the antitrust laws and was successful; and Attorney A later appears in court then representing the same Corporation X in a subsequent divestiture proceeding, the first ethical consideration is that Corporation X would be the same party in both proceedings. That the divestiture proceedings had some different legal issues would be relevant but by no means determinative. These issues must be approached with the understanding that protection of the public interest and governmental integrity are the principal considerations, not just remote factors. This is why the appearance of propriety, like the appearance of justice in other contexts, must be at the root of the Canon.

Lastly, the Board finds that there was "no information present in the two earlier proceedings which would have aided the applicant in the subject cases before the Board." (Paragraph 27). The demonstrable facts are that: (a) this was a new and novel zoning concept in this jurisdiction; and (b) more residential space upstairs (60 feet to 90 feet in height) means additional car parking space is needed downstairs. The height increase and additional parking were tied together.

For the purpose of this review, the ultimate finding of fact in this case is the BZA finding that the pertinent proceedings were "in no way connected." This is the view of the Bar (Brief for Amicus at 4), and this is the view of the dissent. It is a striking thing in this case that even Mr. Carr, at the BZA hearing, and counsel for Carr, before this court, made no bones about conceding the obvious connection.

At the public hearing before the BZA on the parking exception application, the Hearing Examiner commented:

> [Y]ou are doing it because you want to sell your condominium units and you know [you] can sell them easier if you have those parking spaces with them as opposed to having them without parking spaces.

Counsel for Oliver Carr responded:

> It is very important from a marketing standpoint. There is no doubt about it. . . .

Still later, witness Robert Carr admitted:

> We have always planned to include 157 spaces [one parking space per each condominum unit] in the project and to apply to the Board [for approval later].

At oral argument, counsel for Oliver T. Carr, Jr., et al., stated in answer to a question from the court as to whether there is a direct relationship between an increase in the building's height and additional parking:

> [T]o answer your question directly—is there a relationship between an increase in height of a building and more parking—I think the answer is obviously yes, because if you get more units you are more than likely to get more parking. . . . I don't think there is any doubt about that.[15]

The BZA found nevertheless that there was no connection whatsoever between the two proceedings. But what is more serious—this court accepts that plainly erroneous ultimate finding of fact.

To illustrate, the court states ". . . there is no way one can say to a *reasonable certainty* that in 1975 the height litigation, *premised only on constitutional issues,* had a direct bearing on the number of

---

**14.** *See* Brief for Amicus Curiae, Committee on Legal Ethics of the District of Columbia Bar [hereinafter Brief for Amicus] at 12.

**15.** Oral argument before the hearing division in this case.

dwelling units and parking spaces to which Carr would be entitled." (Emphasis added.)

First of all, as I have related, both Mr. Carr in his testimony before the BZA and Mr. Carr's attorney when before the court, affirmed that obtaining more height on the building resulted in economic need for more parking spaces. It would seem plain that the two are "connected." If, in considering this case, this court can now say the height litigation was premised *only* "on constitutional issues," this may be an indication of why there is a fundamental difference in viewpoints between the majority and the dissent in this case. The plain fact is that prevailing on the constitutional issue was but the procedural vehicle for obtaining more density of marketable space in the building. For the purposes of this case, the height litigation was "premised" on a desire to increase the density of the marketable space. The means used was the proceeding raising the constitutional issue. As the Bar points out, the legal avenues used are not of controlling significance. It is more importantly the economic factors.

Yet, the Board concludes the proceedings were "in no way connected" when it is plain to see they were closely connected. If there is an explanation for this egregious error in the ultimate finding of fact in this case, it must be that the Board simply did not understand its mission. In ignoring the fact-finding errors in this case, this court shirks its review responsibility. We are not spectators. We are here to do a job in appellate review which becomes an appellate court. The crucial findings are fatally defective, and this court looks the other way.

### The Ethical Standard

The majority opinion rejects our Bar's effort to secure an uplifting ethical stan-

dard in the matter of the "revolving door" standard in Washington, D.C. The Bar urged the court to be mindful of this consideration:

> Avoiding the appearance of impropriety goes to the very heart of the legitimacy of the rule of law in our society: the people must have faith that justice can be obtained through our legal system. Code of Professional Responsibility EC 9–1 (1983). For this reason, the committee agrees with the emphasis of the panel majority [16] on the need for "scrupulous care to avoid any *appearance* of impropriety."

(Brief for Amicus Curiae at 10; citations omitted.)

This seems to me to be a fair statement of the underlying purpose of the Canon we are considering. The Bar is aware, on the other hand, that if a reading too broad is given to that ethical standard, it might encourage counsel in other proceedings "to harass, divert or delay decisions upon the merits . . ." by unfounded motions to disqualify. *Id.*

To reach a balance on this problem the Bar suggests that:

> [W]here transactions pertain to a single objective and involve the same property and the same party, public concerns about the fair administration of law usually will support a determination that the transactions are part of the same matter.[17]

*Id.* at 10–11.

The majority rejects this fair-minded approach to the problem, though I find it quite appealing. It is a sensible standard. It does not engage in syrupy rhetoric but, rather, gets down to earth on the issue. But the majority rejects the Bar's "single objective" criteria as "too vague and wooden." I think that was quite unnecessary because it is practical and definitive. It

---

16. The Bar was there referring to the prior opinion of the division in this case, which was necessarily vacated when the court went *en banc.*

17. Incidentally, it will be noted once again, that the BZA made no affirmative finding whatsoever on the presence in this case of the "same party, same property" factors.

avoids "fine ratiocinations." The Bar, in its supplemental brief, later elaborated on the term "single objective." It stated that in real estate development the term was not intended to be a goal as broad as the "general economic development" of an area. The term was meant, says the Bar, to be directed toward a more pointed objective. It is quite apparent in this case that the specific objective of the "same party" in these proceedings was at all times to increase the density of the marketable space in the building, a sufficiently narrow specific objective. To meet the Bar's test, the "single objective" need hardly be as narrow as, for example, to obtain larger elevators or different door knobs for the building in each of the three "transactions" in this case; nor, as the Bar put it (Brief for Amicus at 19), need it have related always to *parking*, though the BZA mistakenly thought so.[18]

In contrast, the essence of the majority opinion in this case in relation to the ethical standard is:

> [O]nly if specific information (as distinct from general agency expertise or contacts) that a former government lawyer may have had access to in one matter *is likely to be useful in a subsequent matter*, will there be a reasonable possibility of the particular improprieties that DR 9–101 (B) is intended to forestall. (Emphasis added.)

Majority opinion at 23.

It is my view, however, that our Bar is eminently correct in the opposing view that the "interest unique to Canon 9 is public confidence in the fair administration of the law."[19] Consequently, says our Bar, there is a need for " 'scrupulous care to avoid any *appearance* of impropriety.' " (Brief for Amicus at 10) (quoting *General Motors Corp. v. City of New York*, 501 F.2d 639, 649 (2d Cir.1974)) (emphasis in original). I agree with the Bar's forthright statement of what the ethical standard should be in this jurisdiction. This standard does not stem from the issue of whether the attorney did or did not take away from the government "useful information" (whatever that may be)[20] later being applied in a case in private practice. The crucial consideration is that the "useful information" requirement successfully writes out of the equation the heart of the ethical rule, *viz.*, the public's conception of impropriety. Instead, it substitutes a test which requires a substantial piece of collateral litigation to determine whether there was "useful information" employed. According to the court, it requires proof that there was an "actual impropriety." (*See supra* note 15, majority opinion). In reality, the court is requiring proof of a misfeasance. This is a rewrite of the Canon.

The concern that lawyers consider the appearance their conduct will present to an independent observer (the public) is the primary reason that Canon 9 has special importance in the context of former government attorneys.[21] The public's perception is particularly important where government attorneys "switch sides" and represent adverse interests in a subsequent proceeding. It has been held that the preser-

---

18. *See* paragraphs 5, 9 and 11 of the BZA decision.

19. Brief for Amicus at 10. The Bar recognizes also that there is a second public interest and this is that the government's ability to hire "talented and well-qualified attorneys" should not be crippled. But the Bar concluded with reason that with the moderate screening provision now in DR 9–102, any potential danger of impairing this governmental interest is now dissipated. (Brief for Amicus at 9–10 and 22.)

20. In our "Ethical Consideration" we say this: After a lawyer leaves ... public employment, he should not accept employment in connec-

tion with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the *appearance of impropriety* even if none exists. EC 9–3 (emphasis added.)

21. Canon 9 creates a special niche for former government attorneys. *See* DR 9–101(B). Furthermore, because of their status as public servants, they are subject to additional ethical constraints in order to prevent potential abuse of public office. *See* EC 9–3; 18 U.S.C. § 207 *et seq.* (1970).

vation of public trust in the scrupulous administration of justice, and in the integrity of the bar, mandate disqualification even in those instances where a former government attorney's conduct may be only arguably improper. *Hull v. Celanese Corp.,* 513 F.2d 568, 570 (2d Cir.1975); New York Co. Lawyer's Association, Comm. on Prof. Ethics, Opinion No. 202.

The "substantial relationship" test has been construed most frequently in court decisions which focused upon an attorney's obligation to keep confidential information received from a former client. The majority opinion has seized upon this line of cases and narrowly confines its analysis to focus exclusively on the passage of information. Such a limited perspective is wrong, since the utilization of "useful information" obtained while in government is not the sole impropriety which the disqualification rule seeks to prevent. As the majority recognizes, resolving the ethical issues associated with side-switching requires balancing the need for capable government attorneys with the interest in public confidence in the administration of law. The majority fails to recognize, however, that in balancing these concerns, it is essential to recognize in accordance with the spirit of Canon 9 that public confidence can be undermined by the *appearance* of ethical improprieties. It is therefore essential that we be concerned with appearances from the public's reasonable perspective—a public that currently is not entirely trusting of lawyers.[22]

Even in criminal law, the Supreme Court often returns to the theme: "... to perform its high function in the best way, 'justice must satisfy *the appearance of justice.*'" *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (quoting *Offutt v. United States,* 348 U.S.

11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954) (emphasis added)); *see also Schweiker v. McClure,* 456 U.S. 188, 196, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982) (discussing the due process requirement of judicial impartiality); *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (discussing the reality that different juries reach different results); *Proctor v. Warden, Maryland Penitentiary,* 435 U.S. 559, 98 S.Ct. 1596, 56 L.Ed.2d 547 (1978) (relief denied had nothing to do with habeas corpus relief requested).

The principal concern is that when an attorney switches from government to private practice and gets involved in a matter in which he previously had substantial responsibility, it may reasonably appear to the public that he conducted his office with the hope of eventual personal gain in the private sector. *See General Motors, supra,* 501 F.2d at 650 n. 20; D.C.Bar Comm. on Legal Ethics, Opinion No. 26 (1977); *Developments in the Law—Conflicts of Interest in the Legal Profession,* 94 HARV. L.REV. 1246, 1430 (1981) [hereinafter cited as *Developments* ]. Involvement in private practice in a "substantially related matter," for example, may create an appearance that the attorney failed to zealously represent the government's interest in anticipation of private employment. *See Woods v. Covington County Bank,* 537 F.2d 804, 814 (5th Cir.1976); D.C. Bar Comm. on Legal Ethics, Inquiry No. 19, at 12 (Tent. Draft 1976); *Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago,* 283 F.Supp. 464, 469 (D.Minn.1968), aff'd, 408 F.2d 1099 (8th Cir.), cert. denied, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 73 (1969). Such an appearance, even if based solely upon representation in two substan-

22. In an October 4, 1983 front page article addressing the public's image of lawyers, the Wall Street Journal reported that "[t]o much of the public, lawyers seem more interested in beating the system than in justice." Wall Street Journal, Oct. 4, 1983, at 1, col. 1. Quoting Lloyd Cutler, a prominent member of our own Bar, the article continued: "We are regarded as more canny than candid, more as servants of our prince—as

mouth pieces or hired guns—than as servants of our consciences." *Id.* In a recent Gallup Poll, also referred to in the Wall Street Journal article, only 24% of those polled rated lawyers high or very high with regard to honesty and ethics; 43% of those surveyed felt lawyers were average in that regard; and 27% stated that lawyers rated low or very low.

tially related matters, logically raises suspicions about an attorney's "overall conduct as a government official." *Woods, supra*, 537 F.2d at 814. The ultimate fear is that the attorney may have neglected issues of public importance to concentrate primarily on developing matters that could prove profitable in private practice. "Side-switching" on related matters, therefore, creates appearances that from the public's perspective call into question the integrity of the attorney involved and the reliability of our legal system. It is a crucial consideration in this case that the majority fails to recognize that this appearance will exist *regardless* of whether the attorney carried "useful information" into private practice.

While the concerns raised by the potential use of confidential information are significant, just as important is the concern that government power may be abused to secure subsequent private gain. *See General Motors, supra*, 501 F.2d at 650 n. 20. Such abuse can occur, for example, when an attorney uses the government position to initiate a suit that he will be able to later develop further in private practice or when he less than vigorously represents the government's interest in order to benefit the position of a potential private employer. The appearance that a public position was compromised through either of these methods can clearly arise without delving into whether the former government attorney had access to or possesses "useful" information. The majority does just what our Bar diplomatically warned against in this case with a certain incisiveness. Focusing on the taking away of information from the government position, it engages in just the type of "fine ratiocination" that, as the Bar cautioned, will "only exacerbate public fears about the fair administration of justice." (Brief for Amicus at 19.) The simple reality ignored by the majority is that from the public's perspective, a substantial *factual* relationship between two matters may well be enough to reasonably give rise to the "appearance" that an attorney may have comprised the government's interests before entering private practice. For this reason, the gloss placed by the majority on "substantially related matters" is entirely at odds with the intended effect of DR 9–101(B).

The fear of blanket disqualification is no longer of genuine concern to law firms which are considering employment of government attorneys. The only remaining disqualification concern is that individual attorneys may be barred from participating in particular matters over which they had substantial responsibility while in the government. It would be most unusual for this concern to be enough to dissuade a law firm from hiring a government attorney, as the number of matters from which an attorney must be screened is obviously limited and is unlikely to involve the bulk of a firm's practice in a particular area.[23]

The practice of screening adequately addresses the concerns that underpin the majority's narrow definition of "substantially related matters." The majority's preoccupation with these concerns is therefore unrealistic and detrimental to what is actually at stake—public confidence in the legal profession and the administration of justice.

The court's unwillingness to invoke Canon 9 to correct improper appearances eviscerates this standard's effect on lawyer's conduct and, thus, runs counter to DR 9–101(B)'s intended purpose. This approach erroneously relegates Canon 9 and its focus on "'appearance of impropriety' to a remote and uncertain role at best." *Armstrong v. McAlpin*, 625 F.2d 433, 452 (2d Cir.1980) (en banc) (Newman, J., dissenting) (*vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981)). It is difficult to accept that a profession which

---

**23.** The American Bar Association formulated the practice of screening in 1975 in Formal Opinion 342. This practice, stated the ABA, serves the purpose of "inhibit[ing] government recruitment as little as possible and enhanc[ing] the opportunity for all litigants to obtain competent counsel of their own choosing, particularly in specialized areas." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 342, at 521 (1975).

prides itself on "maintain[ing] the highest standard of ethical conduct," should be willing to retreat from the general principle that the actions of its members should "merit the approval of all good men." *See* Model Code of Professional Responsibility Preamble (1979); *see also United States v. Trafficante,* 328 F.2d 117, 120 (5th Cir. 1964). Moreover, since access to "useful information"—whatever that is—may be difficult to demonstrate, the guidepost of "appearance" is particularly appropriate in these matters.

The term "substantial relationship" signifies something more than a mere *facial* similarity between the nature of the past and present representations. It is not necessary to treat each distinct form of a proceeding as a separate matter without regard to any underlying factual nexus between such proceedings. After all,

> [t]here may be for various technical reasons, all sorts of separate proceedings conducted under different docket numbers, in some or different form, which all arise from a single set of underlying facts, circumstances, or transactions. In our view, it is the [underlying] *factual relation* between various pleadings or claims which determines whether they constitute the same matter.

D.C. Bar Ethics Opinion No. 92 (emphasis added).

This the BZA did not understand.

The Bar in its brief puts it to the court this way:

> A former government attorney should not ... represent, consult or advise a person concerning a property or project if while in government the attorney opposed or advised that same person regarding his or her same practical objectives regarding that same property or project....

(Brief for Amicus at 13.)

I agree, and it seems evident that it fits this case squarely. It is not open to question that one or the other of the two attorneys at varying times advised or opposed Carr on this building project from its infancy. And it also seems undeniable that there were present at all pertinent times Carr's "practical objectives" regarding construction of a building on the same property.

The Bar in its brief stated the proposition well:

> The "substantial relationship" test used to construe "matter" in DR 9–101(B) should recognize reasonable public perceptions of impropriety and thereby encourage public confidence in the neutral administration of law. Ordinarily, transactions involving the same party, property and objective will justify these apprehensions. In such situations, the potential for disqualification is sufficiently serious that attorneys should take available precautions to avoid the appearance of impropriety.

(Brief for Amicus at 22.)

Saying "it is the key to this case," the court in this case holds that:

> [O]nly if specific information (as distinct from general agency expertise or contracts) that a former government lawyer may have had access to in one matter *is likely to be useful in a subsequent matter,* will there be a reasonable possibility of the particular improprieties that DR 9–101 (B) is intended to forestall. (Emphasis added; footnote omitted.)

This test, which this court now says is "the key to this case," requires a law firm to determine whether its attorney—previously a government attorney—had access to information as a government attorney which was *"likely to be useful in a subsequent matter."* (Emphasis added.) Apparently, the decider must (1) examine all the information to which the former government attorney gained access; and (2) determine whether there was any information "likely to be useful *in a [the]* subsequent matter."* (Emphasis added.) This is a hazy test for this ethical question and will likely require extensive litigation to determine whether one is able to prove "useful information" was available to the

former government attorney. And this is what the court says is "the key to this case."

Translated into this case, it should not have been necessary for the law firm initially to discover what information the two attorneys came upon in the government and then determine whether any such information would be "useful" in the parking proceeding. It was readily apparent that the "parking" proceeding was still another attempt to increase the density of marketable space in the same building by the same property owner. There was thus a "substantial relationship" between the proceedings going far back. The firm should have assigned a different attorney to the case, not a particularly horrendous decision. If one were disenchanted with the "revolving door" canon of ethics there would scarcely be a more effective way of smothering it than to now require the court's "useful information" test.

It is important to realize what the court is here doing in the process of the "fine ratiocinations"[24] of its opinion. The court says:

> In the present case, for example, *we are satisfied that the three land use transactions directed at the same property in the unique, relatively small CR zone, involving Oliver T. Carr and the District of Columbia government in each instance, provide a sufficient factual overlap for a reasonable person to infer that Iverson Mitchell and C. Francis Murphy, while attorneys for the District, may have had access to information from the height litigation and the air rights condominium discussions that could be legally relevant to, or otherwise useful in, the special exception case at issue here.* (Emphasis added.)

That conclusion by the court should have been enough to resolve the ethical issue. What that statement necessarily means is that there is a *reasonable* public perception

of impropriety. If as the court says, and I agree, there is enough here "for a reasonable person to infer that Iverson Mitchell and C. Francis Murphy, while attorneys for the District, may have had access to information from the height litigation and the air rights condominium discussions that could be legally relevant to, or otherwise useful in, the special exception case at issue here," then there inevitably is enough here *without more* for a reasonable public perception of impropriety. This is after all not a criminal proceeding. We are here dealing with an ethical standard relating to the public perception of the administration of justice. And we are dealing with a problem that is readily avoided by the use of the moderate screening device in the law firm.

But that is not the court's view of the question. The court's view is that the inference to which I have referred is simply enough to cause a review of the findings of the BZA to determine whether there was actually anything improper. So, in order to determine this the court then turns to the fatally defective findings of the BZA, swallows them whole, no matter how indiscriminate, and proceeds to conclude that the ethical issue vanishes.

The court's view of the ethical standard, and more specifically the grafting of the "useful information" (confidential information) test onto Canon 9 is more properly a test for a case when there is a "vicarious disqualification" involved; by that I mean, a case where the law firm is disqualified if one of its attorneys is disqualified. But the "useful information" test is too protective in this jurisdiction where we have a screening provision which avoids the heavy sanction against the law firm. The presence of the screening provision should require a construction of the Canon as it is written—"to avoid the appearance of impropriety," *i.e.*, to avoid a reasonable public perception of impropriety. The court should realize it must pay more attention to

---

**24.** (Brief for Amicus at 19.) The Bar was introspective in its brief in diplomatically warning against a court opinion resting on "fine ratiocinations."

a reasonable public perception when ethical issues stemming from "revolving door" are before it. Those issues have the additional factor of problems directed toward governmental integrity.

According to the new rule in this jurisdiction being announced today by the court, even though there is an appearance of impropriety, the law firm may properly ignore this if the firm believes the attorney in question did not actually take "useful information" (whatever that may be) away from the government position. The court does not satisfactorily define "useful information" except to say it does not include "agency expertise and contacts." How this is in reality distinguished from "useful information" is not apparent. This illustrates the folly of the court's "useful information" test now being grafted onto the Canon. Before this was done, the Canon specifically related entirely to the "appearance of impropriety."

This is in fundamental conflict with the test proposed by the Bar. The Bar proposes this worldly test:

> [W]here transactions pertain to a single objective and involve the same property and the same party, public concerns about the fair administration of law usually will support a determination that the transactions are part of the same matter.

(Brief for Amicus at 10–11.)

It is readily apparent that the Bar and the court have a philosophical difference in viewpoints on this issue of legal ethics. The court adopts something akin to a punitive test approach (misfeasance) and the Bar views it as a purely ethical question. The Bar's outlook is aspirational. The court approaches it as though a punitive sanction were involved. Yet, the screening provision was intended to allay just those economically punitive fears and remove a financially harsh sanction.

The court approaches the question as though the economic consequences to the law firm were grave in the manner of vicarious disqualification of the entire law firm from the case, and perhaps additional

cases. But that consequence no longer exists due to the screening provision. The court, however, essentially views the issue as if the consequences were still as severe as they were in the past.

This underlying conflict in views is at the root of the fundamental difference between the court and the Bar. The Bar's concern is with a reasonable public perception. The court largely ignores this consideration and is excessively solicitous of the law firms. We in dissent favor the viewpoint of the Bar.

What this all boils down to is that in rejecting the enlightened ethical standard proposed by our Bar, we are presenting an unnecessary rebuff, instead of support, to the legal profession of this city.

### L'Envoi

There is a serious abdication by the court in this case in its review function. Though that is cause enough for concern, the court then rejects our Bar's effort to initiate a public interest oriented ethical standard relating to the "revolving door" between government employment and private practice. This Canon is especially important because it has a particular effect on the integrity of the executive branch in this seat of government. It is to me incomprehensible that an appellate court would decline an edifying standard of ethics which was urged upon the court by its own Bar. The court was assured by the Bar that there is nothing about its proposed interpretation that inhibits lawyer recruitment by the government; and that it would not unreasonably restrict private practitioners. Even this assurance was not enough for the court. One can only speculate whether the court somehow viewed the interest of law firms as being different from the interest of the Bar. I must say it does give one an uneasy feeling to read in the majority opinion that the court should not read our Canon of Ethics "broadly enough to ... require disqualification solely *on the basis of unseemly appearances*." (Emphasis

added.) I should have thought that if the appearance is "unseemly," we would require the law firm to screen the attorney causing this undesirable consequence and substitute another attorney—a step that is moderate enough.

As learned counsel for the Bar put it to the en banc court in oral argument while urging adoption of the "appearance of impropriety" test, "what the rule should do is create" an "assurance of honest administration of the law." That surely is not too much to ask of the court. For those of us in dissent, it is an appeal by our Bar which we would not turn down.

There is a certain irony in the whole affair. Ordinarily, the Bar is apt to be criticized for being overly protective of its members in matters of ethics. But here the Bar is urging on the court a reasonable and high-minded ethical standard and the court rejects it—almost as if it were necessary for the court to protect the Bar from itself on a matter grounded in economic considerations for local law firms. There is a bit of wry humor in this decision.

There is always another day and another case. Decisions such as this have a way of living a short life. If the Bar does not grow indifferent, another opportunity will arise before long to once again urge its enlightened rule, and the next time perhaps judicial feet will not be in concrete. If so, the Bar may then be successful in coaxing the court to get abreast of the historical public interest tide which is flowing in the field of legal ethics.

KERN, Associate Judge, Retired, dissenting:

The majority's treatment of two attorneys switching from the employ of the District of Columbia Corporation Counsel's office to the law firm employed by a major legal antagonist of the District concerning the development of the Westbridge property necessarily brings to mind Eugene Field's charming lullaby, "Wynken, Blynken and Nod."

Specifically, the majority appears to *wink* at the specific ethical consideration here involved, that a lawyer leaving public employment "should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving [government service], since to accept employment would give the appearance of impropriety even if none exists." The lawyers here represented the District at the time the developer had obtained a favorable judicial ruling on the height of the Westbridge and then subsequently represented the developer when he obtained a favorable ruling from the Board of Zoning Adjustment of the District of Columbia for additional parking spaces for the Westbridge. This obviously created the appearance of impropriety—even if none existed.

The majority appears to *blink* at the straight-forward approach recommended to this court by the Bar's Committee on Legal Ethics in this case as *amicus curiae* that:

> Avoiding the appearance of impropriety goes to the very heart of the rule of law in our society: the people must have faith that justice can be obtained through our legal system.

> \* \* \* \* \* \*

> Where transactions pertain to a single objective and involve the same property and the same party, public concerns about the fair administration of law will support a determination that the transactions are part of the same matter.

Of course there is substantial public concern about the fair administration of law when lawyers in the matter of the Westbridge development switch during such development from representation of the District to representation of the Westbridge developer. Hence, the Bar Committee properly called upon this court to allay such public concern by enforcing the applicable canon and ethical consideration and this court did not heed the call.

Finally, the majority appears to *nod*, as if dozing, while the Board on remand in this case first applied the wrong test in

 77

determining whether the law firm violated the Canons, *viz.*, the Board considered whether the lawyers worked on the "same" or "identical" matter rather than whether they worked on "substantially related" matters, and then the Board, compounding its initial mistake, rendered crucial findings of fact concededly without any support in the evidence, *viz.*, "[T]he issues presented by the special exception proceeding [seeking more parking for the Westbridge] are in no way connected to the height litigation [seeking a higher building for Westbridge] ... Neither the same facts, events, nor transactions were at issue in [these] ... proceedings." [1] Surely, this court cannot dodge its statutory responsibility to review administrative agency rulings by limply deferring to an agency that applies the incorrect test and then makes findings which all agree are unsupportable.

Poetry aside, the legal profession has continuously wondered and worried about the low opinion, measured by polls, in which it is held by the public. The majority by its decision here does nothing to enhance the public's low esteem of the profession. The court tells the citizens of the District of Columbia that the "law" is: There is no appearance of impropriety, and hence, no violation of ethical rules when lawyers of the Corporation Counsel's Office who opposed the developer's request to enlarge the Westbridge then turn around as members of the firm representing the developer and present his request to increase the parking for the Westbridge. The citizens of the District, under these circumstances, surely will echo Mr. Bumble's pungent characterization of the "law": "If the law supposes that, the law is a ass—a idiot ... and the worst I wish the law is that his eye may be opened by experience—by experience." [2]

I can only hope that experience and our ethically sensitive Bar will effect the necessary clarification to allay public concern over the fair administration of the law which the decision of this case necessarily raises.

... the answer is obviously yes ... I don't think there is any doubt about that.

1. But, counsel for petitioner conceded to this court during oral argument of this case:
 [I]s there a relationship between an increase in height of a building and more parking[?]

2. CHARLES DICKENS, OLIVER TWIST, *ch. 51.*